MICHAEL ANTHONY JEWELERS,
INC., Plaintiff,

v.

PEACOCK JEWELRY, INC., Mr.
Craftsman, Inc., and Frank
Vairo, Defendants.

No. 90 Civ. 2541 (LBS).

United States District Court,
S.D. New York.

May 28, 1992.

Weil, Gotshal & Manges (Peter D. Isakoff, of counsel), Curtis, Morris & Safford, P.C. (Edgar H. Haug, of counsel), New York City, for plaintiff.

Morrison Law Firm (Roger S. Thompson, of counsel), Mt. Vernon, N.Y., for defendants.

## OPINION

SAND, District Judge.

Plaintiff Michael Anthony Jewelers, Inc. ("MAJ") and defendant Peacock Jewelry, Inc. ("Peacock")[1] are both New York corporations engaged in the manufacture and sale of gold jewelry. Of particular rele-

---

1. In addition to Peacock, MAJ named Mr. Craftsman, Inc. and Frank Vairo (the President of Peacock and Mr. Craftsman, Inc.) as defendants. The parties have referred to the defendants collectively as "Peacock" throughout these proceedings, however, and we will continue to do so in this Opinion.

vance to this lawsuit is the companies' involvement in the manufacture and sale of "diamond-cut" gold charms.

MAJ commenced this action on April 13, 1990, initially alleging claims of trademark infringement and unfair competition against Peacock. On Peacock's consent, a preliminary injunction was entered restraining Peacock from imitating, copying, counterfeiting, manufacturing or otherwise making unauthorized use of MAJ's trademark. MAJ thereafter applied for leave to amend its complaint to add claims under the Copyright and Gold Stamping Acts, which was granted without opposition. *See* Memorandum Endorsement dated November 19, 1990.

In June 1991, shortly before discovery was scheduled to close, Peacock moved for leave to amend its answer by adding counterclaims. After briefing and oral argument, this Court granted Peacock's motion. *See* Memorandum Endorsement dated July 2, 1992.

By Notice of Motion filed August 26, 1991, MAJ moved pursuant to Fed.R.Civ.P. 12(b)(6) and 9(b) to dismiss three of the four counterclaims asserted by Peacock. Specifically, MAJ sought dismissal of those counterclaims alleging violations of the Sherman Act, 15 U.S.C. § 2 (Supp.1992), the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961 *et seq.* (1984) and New York's law of unfair competition. Oral argument was held on the motion on September 30, 1991. During that hearing, and after MAJ had argued that Peacock's pleading suffered from numerous substantive and procedural deficiencies, this Court offered Peacock the opportunity to file an amended countercomplaint before we ruled on MAJ's motion. Peacock agreed to file such an amended countercomplaint by October 15, 1991, and

MAJ was given until October 29, 1991 to file a supplemental motion addressing it. *See* Transcript dated September 30, 1991 at 12 (hereinafter "September Transcript").

Although we had originally told the parties that we would decide MAJ's motion on submission, Peacock's amended countercomplaint contained several variations on the original counterclaims as well as a completely new claim under the Lanham Act, 15 U.S.C. § 1125 (1982 & Supp.1992).[2] In addition, Peacock filed a motion to join Michael and Anthony Paolercio as counterdefendants. In light of those developments, MAJ requested further oral argument, which was held on November 21, 1991.

Currently before us are Peacock's motion to join and MAJ's motion for partial dismissal of the amended countercomplaint.[3] For the reasons that follow, the motion to join is granted and the motion to dismiss is granted in part and denied in part.

## I. BACKGROUND

Peacock's amended countercomplaint asserts claims of copyright invalidity, monopolization and attempted monopolization, civil RICO, false advertising under the Lanham Act, and unfair competition under New York law. Because an understanding of the nature of the parties' business is helpful in assessing the validity of the claims, some background is provided herein.

As mentioned previously, MAJ and Peacock are companies involved in the manufacture and marketing of gold jewelry, including the manufacture of diamond-cut gold charms. The term "diamond-cutting" describes one of apparently two processes by which the imperfections left by the casting of the charms are rendered less visible.

**2.** Following Peacock's submission of the amended countercomplaint, MAJ objected strenuously to Peacock's addition of the Lanham Act claim and to the variation of other claims asserted in the original countercomplaint. MAJ's objection was apparently founded on Peacock's failure to seek leave to add these claims pursuant to Fed.R.Civ.P. 15(a). During oral argument on November 21, 1992, however, we made clear that we would permit Peacock to assert the new

claims in light of the stated preference for liberal amendment under rule 15(a). *See* Transcript Proceedings dated November 21, 1991 at 3 (hereinafter "November Transcript").

**3.** MAJ has not moved to dismiss Peacock's first counterclaim, which seeks a declaration of the copyrights' invalidity. *See* November Transcript at 23.

Unlike "polished" charms, whose mold lines and imperfections have been carefully sanded out, diamond-cut charms obtain their luster by being run over by a rapidly rotating wheel with a small diamond on its outer surface. The diamond makes numerous small nicks in the face of the charm, leaving it with a shiny surface that reflects light. Because polishing is more labor-intensive and requires greater skill than diamond cutting, polished charms are generally more expensive than their diamond-cut counterparts.

Although Peacock's amended counterclaims are asserted under a number of different legal theories, the factual backdrop to all of them is virtually identical. According to the allegations in the amended countercomplaint, MAJ engaged in a variety of unlawful practices, all with the intended purpose of increasing its share of the diamond-cut charm market and driving its competitors out of business.

*Copying Charms, Obtaining Fraudulent Copyright Registrations, and Engaging in Sham Litigation.*

Perhaps the most thoroughly developed allegations in Peacock's amended countercomplaint are those relating to MAJ's "practice of copying charms manufactured by others." ¶ 99. According to Peacock's pleading, MAJ gained access to its competitors' charms in a number of ways. In the first place, MAJ did casting for companies that lacked the facilities to cast their own charms. Because those companies had to leave their molds with MAJ to have them cast, MAJ had the opportunity to make duplicate molds.

One of the companies that had MAJ do its casting was the Old Mr. Craftsman,[4] whose assets Peacock acquired in 1985. After Steven Wrona, an Old Mr. Craftsman employee, noticed that some of the charms resulting from molds left for casting with MAJ had different mold lines and bore

markings indicating that they were copyrighted and/or trademarked by MAJ, Mr. Wrona deduced that MAJ had made unauthorized copies of the charms. ¶¶ 93–95. Mr. Wrona conferred with the Old Mr. Craftsman's President, and the two men demanded the return of the duplicate molds. MAJ complied, and the "several hundred" counterfeit molds were brought back to the Old Mr. Craftsman's premises where they remained unused for several years. ¶¶ 96, 98.

Another means by which MAJ gained access to its competitors' charms was by letting its employees use MAJ's facilities to do extra work for other companies. One MAJ employee who took advantage of that practice was Joseph Triburgo, who "moonlighted" for other companies by polishing their charms. When Mr. Triburgo did such work, Anthony Paolercio "often looked at the charms ... brought in for polishing" and "[w]hen one of the designs appealed to him, [he] directed that the charm be copied." ¶ 100. MAJ, acting "at the direction of Michael Paolercio and/or Anthony Paolercio," would thereafter

> mark the copied charms with MAJ's own trademark and copyright notice. MAJ, therefore, would represent to the consuming public that MAJ had originated the design of the charms marked with its copyright notice, even though those charms may have been copied without permission from charms designed (and copyrighted) by others, or in the public domain.

¶ 102.

According to the amended pleading, MAJ was not content to simply copy the charms of its competitors. Instead, it would "apply for copyright registrations in its own name for charms that were copied from designs originated by others." ¶ 130. In each application to the Copyright Office, MAJ would "willfully omit reference to any

---

**4.** According to the amended countercomplaint, the "Old Mr. Craftsman" is a now-defunct corporation (¶ 12) whose assets Peacock acquired in 1985 (¶ 106). Although the corporation's name was actually "Mr. Craftsman, Inc.," the parties have referred to it as "the Old Mr. Craftsman" to distinguish it from the "new" Mr. Craftsman,

Inc., which was formed by Peacock in 1985 and which is named as a defendant in this action. We follow the parties' practice of differentiating between the two corporations by referring to them as the "Old Mr. Craftsman" and the "New Mr. Craftsman" in this Opinion.

work from which its designs were copied, and claim that it originated designs that it, in fact, copied from others." *Id.* MAJ applied for and fraudulently obtained copyright registrations in at least thirteen charms copied from the Old Mr. Craftsman. *See* ¶¶ 133, 142, & Exh. C (copies of the registrations). MAJ thereafter marked its charms with the copyright notice and "promoted" and otherwise "advertised" its "original" designs to the consuming public. ¶¶ 146, 148.

As a final part of its scheme to dominate the market in diamond-cut gold charms and to harm its competitors, MAJ sought to enforce those copyrights by engaging in litigation against Peacock and others. According to the amended countercomplaint, such litigation was in bad faith in that MAJ attempted to enforce copyrights that it knew were invalid. ¶¶ 157, 158.

*Unlawful Inducements.*

In addition to the charges of counterfeiting and copyright misuse, Peacock alleges that MAJ offered certain "unlawful inducements" to its customers and employees in an effort to bolster sales and foster employee loyalty. In terms of the inducements to customers, Peacock asserts:

> MAJ offered membership in what was termed its "Million Dollar Club" to customers who purchased at least one million dollars worth of MAJ's products during any single year. Membership in the Million Dollar Club carried with it certain perquisites, among them, the provision of cocaine and prostitutes by MAJ.

¶ 114. Such perquisites were allegedly offered at dinner or Christmas parties, hosted by either or both of the Paolercios, and by bringing customers to a Connecticut brothel frequented by Michael Paolercio. ¶¶ 115–121.

In terms of the inducements to employees, Peacock alleges that Michael and Anthony Paolercio offered the employees cocaine in lieu of or in addition to their regular salaries. Such perquisites were allegedly offered to induce employees to work late and to foster loyalty to the company. ¶¶ 125–129.

## II. DISCUSSION

### A. *Peacock's Motion to Join*

Before turning to MAJ's motion to dismiss, we first address Peacock's motion to join Michael and Anthony Paolercio as counter-defendants. According to the amended countercomplaint, Michael Paolercio is the President and Principal Executive Officer of MAJ. ¶ 3. In addition, he owns or controls approximately 1,734,000 shares of MAJ, which represents about 23.7% of its outstanding equity. ¶ 4. Anthony Paolercio is the Executive Vice President and Principal Operating Officer of MAJ. ¶ 5. He owns or controls approximately 1,714,-000 shares of the company, which represents about 23.5% of its outstanding equity. ¶ 6. The amended countercomplaint alleges upon information and belief that the two Paolercios make or control all major policy and directional decisions on MAJ's behalf. ¶ 7.

Initially, MAJ did not oppose Peacock's motion to join on the assumption that it sought to join the Paolercios solely for the purposes of the RICO counterclaim and solely to the extent that that counterclaim was brought under 18 U.S.C. § 1962(c). At oral argument, however, Peacock's counsel stated that while one of the purposes of the motion was to satisfy § 1962(c)'s requirement that Peacock allege a RICO "person" separate from the RICO enterprise, it sought to add the Paolercios as counter-defendants in all of the amended counterclaims.

MAJ objects to this broader reading of Peacock's motion on the basis that it fails to proffer any particular reason for seeking the Paolercio's joinder. While MAJ is correct that the motion does not allege any particular grounds for joining the Paolercios, that observation is counterbalanced by the fact that discovery relating to the counterclaims began only recently and, given that Michael and Anthony Paolercio are alleged to have made all policy and directional decisions on MAJ's behalf, would encompass essentially the same issues regardless of whether or not they were added as counter-defendants.

In light of the fact that MAJ will suffer no prejudice by virtue of the addition of the Paolercios, as well as MAJ's own concession that they would have had to have been added as counter-defendants for the purposes of the § 1962(c) claim, we grant MAJ's motion in its entirety. The individual defendants may move to dismiss as to the non-RICO causes of action following completion of discovery.

## B. *MAJ's Motion to Dismiss*

In reviewing MAJ's motion to dismiss, this Court is required to accept the allegations in the amended countercomplaint as true and to construe them in the light most favorable to Peacock. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Dacey v. New York County Lawyers' Ass'n,* 423 F.2d 188, 191 (2d Cir.1969), *cert. denied,* 398 U.S. 929, 90 S.Ct. 1819, 26 L.Ed.2d 92 (1970). The contested counterclaims will be dismissed only if Peacock can prove no set of facts that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir.1985).

While the bulk of Peacock's allegations need only conform to the liberal pleading requirements of Fed.R.Civ.P. 8(a), the mail fraud allegations underlying its RICO counterclaim and certain fraud-based aspects of the antitrust counterclaim must comply with the more stringent pleading requirements of Fed.R.Civ.P. 9(b) to survive dismissal.[5] Rule 9(b) provides that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." With these background principles in mind, we now address each of the contested counterclaims in turn.

## 1. The Antitrust Counterclaim.

Section 2 of the Sherman Act states that no person may "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations...." 15 U.S.C. § 2. Peacock's Second Counterclaim alleges that MAJ violated this provision by either monopolizing or attempting to monopolize the diamond-cut gold charm industry.

In order to state a claim of monopolization under § 2, Peacock must adequately allege two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition of that power as distinguished from the growth or development of a business as a consequence of a superior product, business acumen or historical accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966); *Energex Lighting Indus., Inc. v. North American Philips Lighting Corp.,* 765 F.Supp. 93, 101 (S.D.N.Y.1991). In order to allege a claim for attempted monopolization, Peacock must plead "(1) a 'dangerous probability of success' in monopolizing a given product market and (2) a specific intent to 'destroy competition or build monopoly.'" *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832, 841 (2d Cir.1980), quoting *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953). In addition, in order to have standing to bring this private antitrust action, Peacock must prove that it suffered an "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [MAJ's] acts unlawful." *Brunswick Corp.*

---

5. In its initial memorandum of law, MAJ argued that this Court should follow other district courts that have held that because a RICO action threatens the reputation of a defendant, the heightened pleading requirements of Rule 9(b) should extend to *all* RICO predicate acts. *See* MAJ's Memorandum of Law in Support of Motion to Dismiss at 22 (citing cases). In the recently decided case of *McLaughlin v. Arthur Anderson,* 962 F.2d 187, 194, (2d Cir.1992), how-

ever, the Second Circuit made clear that because "rule 9(b) applies only to claims of fraud or mistake," the district court erred in subjecting a predicate act of extortion to its scrutiny. In light of that clear pronouncement by the Second Circuit, we limit the application of rule 9(b) to the allegations of fraud under the antitrust counterclaim and mail fraud under the RICO counterclaim.

*v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *see also Centrig Indus. Contracting Corp. v. Anheuser–Busch Co., Inc.*, No. 89–2744, 1991 WL 4719, at *1–2, 1991 U.S. Dist. LEXIS 458, at *4 (S.D.N.Y. Jan. 16, 1991); *Berman v. Riverbay Corp.*, No. 89–5538, 1990 WL 116765, at *2, 1990 U.S. Dist. LEXIS 3372, at *5 (S.D.N.Y. March 29, 1990).

Taking Peacock's allegations as true, and construing them in the light most favorable to Peacock as we must on a motion to dismiss, Peacock appears to have stated claims under either theory. Turning to the monopolization claim first, Peacock has alleged that the relevant market is diamond-cut gold charms, and that MAJ holds 70% of that market (¶ 154). Peacock has also alleged that MAJ obtained its position in the market through a concerted pattern of exclusionary conduct, including the copying of competitors' charms, the fraudulent procurement of copyright protection, and the maintenance of sham litigation to protect its monopoly over those designs.[6] Finally, Peacock has asserted that it suffered an "antitrust injury" by virtue of the deflection of its customers to MAJ and the costs of defending against this sham copyright litigation. Peacock's attempted monopolization claim is adequately pleaded for essentially the same reasons: MAJ's 70% market share and continued efforts to strengthen its position through sham copyright litigation pose a "dangerous probability" of successful monopolization, and MAJ has engaged in such action "with the specific goal of securing a monopoly position

in the market for diamond cut gold charms in the United States" (¶ 162).

Despite the facial adequacy of Peacock's allegations, MAJ proffers a number of reasons why the antitrust counterclaim should be dismissed. Specifically, MAJ contends that Peacock: (1) has not asserted a plausible relevant market; (2) has not demonstrated its exclusionary power; and (3) has not demonstrated an antitrust injury. In addition, MAJ argues that (4) Peacock's sham litigation claim is foreclosed by the *Noerr–Pennington* doctrine; and, finally, (5) that the allegations of fraud underlying the antitrust claims are not pleaded with particularity. Each of these arguments is taken up below.

*The Relevant Market.*

██ MAJ's first objection to the amended pleading targets Peacock's definition of the relevant market. While Peacock defines that market as comprised of diamond-cut gold charms, MAJ proposes a broader definition including non-diamond-cut gold charms or at least other inexpensive charms made of silver.

This Court does not dispute MAJ's contention that in determining the relevant market for the purposes of a monopolization claim, our definition must include "alternative sources of, and substitutes for, [a] defendant's product which reflect commercial realities." *Theater Party Assoc., Inc. v. Shubert Organization, Inc.*, 695 F.Supp. 150, 155 (S.D.N.Y.1988); *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1271 (9th

---

**6.** Peacock has also alleged that MAJ obtained and maintained its monopoly by offering unlawful inducements to its customers and employees. MAJ argues that such acts, even if prohibited under some other body of law, are not cognizable under the antitrust laws. *See* MAJ's Supplemental Memorandum in Support of Motion to Dismiss at 8 (citing *Data General Corp. v. Grumman Sys. Support Corp.*, 761 F.Supp. 185, 189 (D.Mass.1991)) (While illegal and unscrupulous acts are "of concern," they "have minimal connection to the monopolist's exercise of exclusionary powers."); *see also* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 737b, at 278 (1978) (In considering whether business torts are actionable under the antitrust laws, "[t]he antitrust court must ... insist on a pre-

liminary showing of significant and more-than-temporary harmful effects on *competition* (and not merely upon a competitor or customer) before considering a tort as an exclusionary practice.... In general, we doubt the wisdom of giving much § 2 attention to most of these [immoral or unethical] practices ..., except in rare and gross cases.") (emphasis in the original).

As we discuss in Section 2 *infra*, Peacock's allegations with respect to the unlawful inducements are inadequate, and we have granted Peacock leave to replead them. Because we do not rely on them to sustain the antitrust claims in any event, we need not address at this time MAJ's argument that they may not constitute exclusionary conduct under the antitrust laws.

Cir.1975), *cert. denied,* 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982) ("Where the degree of substitutability in production is high, cross-elasticities of supply will also be high, and ... the two commodities in question should be treated as part of the same market."). Our difficulty with MAJ's position, instead, derives from our inability to conclude that Peacock's definition of the relevant market is patently implausible solely on the basis of the four corners of the amended counterclaim. While arguments concerning substitutability or "cross-elasticity of supply" may be appropriate on a motion for summary judgment, they seem inappropriate in the context of a motion to dismiss. MAJ's argument that the antitrust counterclaims must be dismissed for failure to allege a plausible relevant market must therefore be rejected.

*Exclusionary Power.*

 MAJ next contends that even if the relevant market is diamond-cut gold charms, the "facts alleged by Peacock simply do not add up to ... exclusionary power." MAJ's Memorandum of Law in Support of Motion to Dismiss at 15. Specifically, MAJ argues that in light of the "infinite number of charm designs available and the limited exclusionary power of copyrights,"[7] MAJ's fraudulent procurement and enforcement of thirteen copyrights cannot amount to exclusionary market power. MAJ's Supplemental Memorandum of Law in Support of Motion to Dismiss at 11. We disagree for several reasons.

In the first place, to the extent that MAJ is claiming that the nature of the monopoly conferred by a copyright somehow renders it exempt from the antitrust laws, we reject that notion in its entirety. As prior cases have indicated, the "[f]raudulent procurement of a copyright by means of knowing and willful misrepresentations to the Copyright Office may strip a copyright holder of its exemption from the antitrust laws," as long as the other aspects of a monopoliza-

tion or attempted monopolization claim are present. *See Knickerbocker Toy Co. Inc. v. Winterbrook Corp.,* 554 F.Supp. 1309, 1321 (D.N.H.1982).

The Supreme Court's decision in *Walker Process Equip., Inc. v. Food Machinery & Chemical Corp.* lends further support to our position. *Walker Process* addressed the antitrust consequences of the fraudulent procurement of a patent, and concluded that the enforcement of a patent procured by fraud on the Patent Office may violate § 2 of the Sherman Act provided the other elements of the violation are also stated. 382 U.S. 172, 174, 86 S.Ct. 347, 348–49, 15 L.Ed.2d 247 (1965). Although MAJ would have us limit the application of *Walker Process* to the patent context, we agree with the *Knickerbocker* court that such a limitation would be anomalous in light of the Supreme Court's observation that " '[c]ertainly the rights of the copyright owner are no greater than that of the patentee.' " *Knickerbocker,* 554 F.Supp. at 1321 n. 19 (citing *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 143, 68 S.Ct. 915, 922, 92 L.Ed. 1260 (1948)).

In addition to our rejection of some theoretical bar to a finding that the bad faith procurement and enforcement of a series of copyrights may amount to exclusionary power, we also note that MAJ's challenge to Peacock's showing with respect to this element misses the fundamental thrust of Peacock's theory of recovery. In alleging that MAJ's conduct amounts to an exercise of exclusionary power, Peacock does not claim that the mere procurement of thirteen copyrights confers on MAJ the power to extract monopoly rents and to exclude competitors. It relies, instead, on the notion that MAJ's usurpation of charm designs created by others or in the public domain, combined with this and other bad faith litigation to enforce its fraudulently obtained copyrights, has caused Peacock to lose business in and have difficulty pen-

---

7. When describing the copyrights' "limited" exclusionary power, MAJ apparently refers to the fact that "copyright (as opposed to patent) protection may, under certain circumstances, extend to two works similar or even identical in expression," provided the subsequently created work is not copied but "is rather a product of the independent efforts of its author." *Knickerbocker Toy Co., Inc. v. Winterbrook Corp.,* 554 F.Supp. 1309, 1317 (D.N.H.1982) (citations omitted).

etrating a market with allegedly high barriers to entry. *See* ¶¶ 53–63. Because we find that these allegations sufficiently allege exclusionary power, MAJ's motion to dismiss the counterclaim on this basis must be denied as well.

*Antitrust Injury.*

■ MAJ next asserts that the antitrust claims are inadequate because Peacock has failed to allege an antitrust injury. In support of this contention, MAJ contends that Peacock has not specified a single customer or sale lost as a result of MAJ's alleged conduct, and again argues that Peacock cannot possibly be injured by its possession of thirteen copyrights when the potential number of charm designs is infinite.

As discussed above, the requirement of an antitrust injury compels Peacock to demonstrate more than mere causal injury to its business or property. It must also demonstrate that any injury it sustained is

> of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. at 489, 97 S.Ct. at 697 (citation omitted). Despite the stringency of this requirement, we find that Peacock's allegations—read in their most favorable light—state an injury under the antitrust laws.

The amended pleading identifies several potential sources of such injury. First and foremost, Peacock contends that it suffered an injury in the form of defending itself against this allegedly bad faith copyright litigation. Second, Peacock alleges that MAJ's practice of securing and enforcing copyrights in public domain charms prevented it from entering a market that would otherwise have been more open.[8] *See* ¶ 160. Because such injuries, if proved, would flow from the very monopolistic conduct that is unlawful under the antitrust laws, they are sufficient to allege antitrust injury.[9]

*The Noerr–Pennington Doctrine.*

■ In addition to challenging the above elements of the antitrust claims, MAJ argues that this litigation is non-sham as a "matter of law" and therefore should not be considered as evidence of exclusionary conduct. *See* MAJ's Supplemental Memorandum of Law in Support of Motion to Dismiss at 7. In support of that assertion, MAJ argues that it initiated this action in a valid effort to enforce its trademark rights, and that even if the copyright claims were later added in bad faith, its resort to the judicial process is protected under the *Noerr–Pennington* doctrine.

The *Noerr–Pennington* doctrine developed in a trilogy of Supreme Court cases that explored the tension between the Sherman Act and the first amendment rights to petition and association. In *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court held that efforts to influence legislative or executive action were immune from federal antitrust liability, even if intended to eliminate competition. In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the Supreme Court extended that immunity from antitrust liability to the administrative and judicial processes.

---

**8.** Because MAJ's copyright registrations apparently did not deter Peacock from marketing the charm designs it acquired from the Old Mr. Craftsman, we assume that MAJ's allegations regarding its reluctance to enter the market refer to MAJ's practice of fraudulently obtaining copyrights in *other* public domain works. *See, e.g.,* ¶¶ 99, 101, 145 (referring to the copying and copyrighting of charms copied from other competitors).

**9.** Peacock also suggests that it was injured because MAJ's placement of a copyright notice on its charms may have deterred customers from purchasing Peacock's charms out of a belief that the latter charms were infringing. *See* ¶ 148. Because, as we discuss in Section 3 *infra*, Peacock has failed to allege that MAJ's copyright notice was even visible to potential customers, this allegation of injury is inadequate as currently pleaded.

Although the *California Motor* Court broadened the scope of antitrust immunity in some respects, it nonetheless emphasized that the *Noerr–Pennington* doctrine was not absolute. Expanding on the "sham exception" foreshadowed in *Noerr*, the Court stated that the doctrine would not apply where a defendant's invocation of the adjudicative process " 'is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.' " *California Motor*, 404 U.S. at 511, 92 S.Ct. at 612 (quoting *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533). While the Court did not elaborate on the contours of the sham exception, it did state that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process," and that unethical conduct in the latter arena, such as inducing the perjury of witnesses, enforcing a patent obtained by fraud, or bribing an official, could give rise to a finding of sham activity. *See id.* 404 U.S. at 512–13, 92 S.Ct. at 612–13.

Applying these principles to the case at hand, we are unable to conclude as a "matter of law" that this litigation is protected under the *Noerr–Pennington* doctrine. MAJ argues that because the action was initiated for a non-sham purpose—namely the protection of its trademark rights—the suit was by definition something other than an attempt to interfere with the business relations of a competitor and therefore fails to fall within the sham exception.[10] We decline to construe *Noerr–Pennington* so broadly, however, and instead find that if the copyright claims themselves were added for an anticompetitive purpose, that might be sufficient to bring them within

the sham exception to the doctrine. Because we cannot adequately assess MAJ's purpose in adding the copyright claims at this juncture of the proceedings, MAJ's contention that this litigation is "non-sham" as a matter of law must be rejected.

*Rule 9(b).*

Peacock's antitrust claim relies heavily on charges of fraud and therefore those allegations must be scrutinized under Fed.R.Civ.P. 9(b). In order to conform to the requirements of that rule, Peacock's fraud allegations must specify the time, place, speaker and content of the alleged misrepresentations, *see Cosmas v. Hasset*, 886 F.2d 8, 11 (2d Cir.1989), and must state specific facts supporting the claims of fraud.

In this instance, Peacock's fraud charges are premised on allegedly false representations of originality to the Copyright Office. Because those alleged misrepresentations are contained in the applications for copyright registration, each of which Peacock has attached as exhibit C to its amended countercomplaint,[11] they satisfy the rule's requirement that the misrepresentations be identified with particularity. *See Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986) (holding that misrepresentations made in a written document such as an offering memorandum satisfy 9(b)'s requirements as to time, place, and content of the alleged misrepresentations). In addition, by setting forth the detailed history by which MAJ gained access to and allegedly copied the charm designs, Peacock has provided a factual basis for its claim that the representations of originality were false. Finally, Peacock has adequately alleged scienter in stating that MAJ should have known that

---

10. MAJ does cite one case in support of this proposition, *see Aircapital Cablevision, Inc. v. Starlink Communications Group, Inc.*, 634 F.Supp. 316, 322 (D.Kan.1986) (because the plaintiff had brought at least one of the claims in its complaint in good faith, the lawsuit did not become "sham" "even if the [copyright] infringement claims were included spuriously"). While this Court is not bound by a decision of the District of Kansas, we note that in *Aircapital*, the predicate lawsuit had already been resolved, and the trial court therefore had a much better sense of whether or not it was brought in

good faith. In light of the fact that discovery has not even closed in this action, this Court is confronted with an entirely different factual situation.

11. Because Peacock has attached these copyright registrations to the amended countercomplaint and referred to them in its allegations, the amended pleadings are deemed to include them for the purposes of Rule 12(b)(6). *See Goldman v. Belden*, 754 F.2d 1059, 1065–66 (2d Cir.1985).

the charms were not original at the time it applied for copyright protection, given its long history of casting the Old Mr. Craftsman's charms and the fact that the Old Mr. Craftsman had sold each of the charms prior to the date MAJ claimed to have first published them. *See* ¶ 142. These allegations are sufficient to survive dismissal under rule 9(b). Accordingly, MAJ's objections on those grounds are rejected, and the application to dismiss the antitrust counterclaim is denied in all respects.

### 2. The Civil RICO Counterclaim.

The Racketeer Influenced and Corrupt Organizations Act prohibits four types of conduct: using or investing income derived from a pattern of racketeering to acquire an enterprise engaged in or affecting commerce, 18 U.S.C. § 1962(a); acquiring an interest in or control of such an enterprise through a pattern of racketeering activity, *id.* § 1962(b); conducting the affairs of an enterprise through a pattern of racketeering activity, *id.* § 1962(c); and conspiring to commit any of the previously mentioned violations, *id.* § 1962(d). *See Jacobson v. Cooper*, 882 F.2d 717, 719 (2d Cir.1989). Section 1964(c) creates a private right of action. Peacock's amended countercomplaint asserts violations of all four RICO subsections.

In order to satisfy the threshold pleading requirements under any of those subsections, Peacock must allege the following: that the defendants (2) through the commission of two or more predicate acts (3) constituting a pattern (4) of "racketeering activity" (5) directly or indirectly invest in, or maintain an enterprise in or participate in, (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce. *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). In addition, because this is a civil action, Peacock must demonstrate that it was injured in its business or property "by reason of" the commission of the predicate acts. *Sedima, S.P.R.L. v. Imrex, Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Sperber v. Boesky*, 849 F.2d 60, 61 (2d Cir.1988).

During the first oral argument in September 1991, MAJ asserted that the RICO counterclaim was unduly vague and suffered from a number of substantive deficiencies. Peacock appears to have taken MAJ's criticisms into account in drafting the amended counterclaim, which attempts to set forth the contours of the RICO violation with greater specificity. According to the amended countercomplaint, "[t]he racketeering enterprise involved in this case is MAJ, and the 'persons' involved in directing that enterprise are Michael and Anthony Paolercio." ¶ 167. The predicate acts are of three types: violations of the Mann Act, state and federal narcotics offenses, and various acts of mail fraud. ¶ 169. The amended countercomplaint further alleges that the commission of these predicate acts comprised "a common scheme to profit from the predicate felonies, and advance MAJ in the market." ¶ 171.

Despite Peacock's efforts to clarify the pleading of its RICO claims, MAJ argues that dismissal is still warranted for a number of reasons, including Peacock's failure to allege two viable predicate acts. As the following discussion of each of the predicate acts will reflect, we agree and therefore dismiss the RICO counterclaim for failure to state a cause of action.

*The Narcotics Offenses.*

As one of the predicates for its RICO violation, Peacock alleges that MAJ engaged in "[m]ultiple acts of the possession and distribution of controlled substances in violation of state and federal laws." ¶ 169(c). As the basis for those charges, Peacock points to its allegations regarding the provision of cocaine to MAJ's customers and employees. MAJ contends that these allegations are too vague to survive even the requirements of "notice pleading" under Fed.R.Civ.P. 8, and that they therefore cannot serve as an adequate predicate for the RICO violation.

We have reviewed Peacock's allegations with respect to the alleged narcotics offenses, and agree that they are too imprecise to provide MAJ with notice of the conduct with which it is being charged. As

an initial matter, Peacock's countercomplaint makes no effort to identify a timeframe for the alleged narcotics transactions. Typical of Peacock's pleading is the allegation that "Michael Paolercio was observed in the possession of at least four ounces of cocaine, and distributed at least four ounces of cocaine to MAJ's employees" (¶ 127). That statement not only fails to identify the source of the observation, but to provide even an approximate date—whether day, month, or year—for the alleged possession and or distribution. In fact, the only dates mentioned with respect to the alleged narcotics offenses are the introductory observation that MAJ began offering the unlawful inducements "starting in the early 1980's" (¶ 113), and that a certain Gus Pappas allegedly supplied MAJ with cocaine during the period of "at least" 1983–84 (¶ 128).

In short, we find that Peacock's generalized allegations that MAJ engaged in an unspecified number of narcotics violations over an imprecise period of as many as 12 years violates even the more lenient rule 8(a)'s requirement that the pleadings provide MAJ with "notice" of the claims against it. Although, as we discuss in Part III *infra*, we will allow Peacock the opportunity to replead this claim, the alleged narcotics offenses cannot serve as a predicate for Peacock's RICO violation as set forth in this amended countercomplaint.

*The Mann Act Violations.*

■ Peacock next attempts to meet the predicate act requirement by alleging violations of the Mann Act. That act prohibits any person from

> knowingly transport[ing] any individual in interstate or foreign commerce, or in any Territory or Possession of the United States, with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense ...

18 U.S.C. § 2421 (Supp.1992) (as amended November 7, 1986). As was the case with the narcotics violations, the Mann Act violation must be "indictable" to serve as a predicate for the RICO claim. *See* 18 U.S.C. § 1961(1).

The allegations underlying this aspect of the counterclaim are set forth in paragraphs 119, 120 and 121 of the amended countercomplaint. Although we have construed each of them as generously as is possible, we find that none can support a claim under the Mann Act.

Beginning with the allegation in paragraph 120, Peacock states that on one (unspecified) occasion, "members of the Million Dollar Club were gathered for a celebratory party at which they were advised that prostitutes had been brought in from Paris." Even assuming that these Parisian prostitutes had been transported in foreign commerce, however, this allegation fails to state a claim under the Mann Act because it does not charge any of the counterclaim defendants with having caused their transport. Peacock next alleges in paragraph 119 that "[u]pon information and belief, at least some of the prostitutes provided by Michael and Anthony Paolercio on behalf of MAJ [at various parties] were brought in interstate or foreign commerce in violation of 18 U.S.C. § 2421." That allegation must fail, however, because it states a pure legal conclusion and merely parrots the requirements of the statute instead of providing notice of the complained of conduct.

Peacock's final allegation with respect to the Mann Act gives us greater pause. In paragraph 121, Peacock asserts: "Upon information and belief, on other occasions, members of the Million Dollar Club were brought to Connecticut by Michael Paolercio, to a brothel he frequented in that state." MAJ argues that this allegation is inadequate because it states only that the *customers* were brought across state lines, rather than the prostitutes themselves. Our reading of the statute, however, suggests that it is gender-neutral, meaning that it punishes the interstate transportation of either men or women, and that it is meant to punish anyone who transports those individuals with the intent that they "engage in prostitution, *or in any sexual activity for which any person can be charged with a criminal offense.*" Assuming that the customers' sexual conduct could give rise to some other criminal

charge, therefore, it is conceivable that Peacock's allegation could state a violation of the Mann Act.

Despite that conceptual possibility, we are unable to find that the allegation—as currently pleaded—is sufficient. As was the case with the alleged narcotics violations, Peacock's pleading with respect to the provision of prostitutes makes no reference to dates of occurrence. Instead, the countercomplaint states only that the unlawful inducements, and this term covers both the cocaine charges and the prostitution charges, were provided "starting in the early 1980's." ¶ 113. While this lack of specificity has consequences in terms of the notice it affords MAJ, it has particular relevance here because of a November 7, 1986 amendment to the Mann Act. Prior to that amendment, the statute punished only those who transported "any woman or girl." In light of the fact that MAJ's transportation of (presumably) male customers would be actionable only if it occurred after the effective date of the amendment, a more detailed pleading is necessary to determine whether it has stated a claim under the Mann Act.

As the above discussion suggests, none of Peacock's allegations are currently adequate to state an "indictable" violation of the Mann Act. Although we will grant Peacock leave to amend the allegation in paragraph 121, at present, the Mann Act claims may not serve as a predicate for the RICO violation.

*The Mail Fraud Charges.*

 The third type of predicate acts asserted in the RICO counterclaim are various acts of mail fraud under 18 U.S.C. § 1341 (1984). The essential elements of a mail fraud violation are: (1) a scheme to defraud an intended victim; (2) of money or property; and (3) use of the mails to further the scheme. *See United States v. Wallach,* 935 F.2d 445, 461 (2d Cir.1991). In this instance, the claim of mail fraud is founded on allegations that MAJ mailed "at least thirteen fraudulent applications" for copyright registration to the Register of Copyrights, on at least four different dates spanning from "shortly before" December 22, 1986 to "shortly before" October 19, 1988. *See* ¶¶ 133–139.

In urging this Court to dismiss the mail fraud claims, MAJ maintains that even assuming it engaged in a scheme to defraud the Copyright Office, Peacock may not assert a violation because it was not deceived by the scheme. As support for this proposition, MAJ relies on dicta from two Second Circuit cases suggesting that the party injured must also be the party deceived to fall within the compass of § 1341. *See Corcoran v. American Plan Corp.,* 886 F.2d 16, 19–20 (2d Cir.1989); *United States v. Evans,* 844 F.2d 36, 39–40 (2d Cir.1988) (noting that "If a scheme to defraud must involve the deceptive obtaining of property, the conclusion seems logical that the deceived party must lose some money or property"); *see also McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 794 n. 13 (1st Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990) (citing the *Corcoran* dicta with approval).

In response to MAJ's contention that there must be a convergence of the party deceived and injured for the mail fraud statute to apply, Peacock cites *Shaw v. Rolex Watch U.S.A., Inc.,* 726 F.Supp. 969 (S.D.N.Y.1989). In *Shaw,* Judge Conner distinguished *Evans* and *Corcoran* on the grounds that in those cases, the plaintiff was the party deceived and not the party injured, whereas in the case before him, the plaintiff was injured but not deceived. *Id.* at 973. Judge Conner found that distinction to be significant, and concluded that "A plaintiff who is injured as a proximate result of fraud should be able to recover regardless of whether he or a third party is the one deceived." *Id.* Peacock urges us to follow Judge Conner's approach and conclude that because it was injured by MAJ's fraudulent scheme, it may assert a violation of the mail fraud statute regardless of whether or not it was deceived.

Although we acknowledge that the issue is an important and potentially dispositive one, we base our decision on an alternative rationale. For the reasons that follow, we find that Peacock has failed to demonstrate

that the scheme deprived it of "money or property" within the meaning of the statute.

*The Money or Property Requirement.*

In *McNally v. United States,* the Supreme Court held that to state a violation of the mail fraud statute, the scheme to defraud must be intended to deprive another of money or property. 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (reversing a mail fraud conviction that was predicated on the charge that the defendant had defrauded the citizens of a state of their intangible right to "honest and impartial government"); *see also Carpenter v. United States,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (applying *McNally* to the wire fraud statute). Although *McNally* has been overruled by the enactment of 18 U.S.C. § 1346,[12] which became effective on November 18, 1988, it applies here because all of the alleged acts of mail fraud occurred prior to its enactment. *See Corcoran,* 886 F.2d at 19 n. 4 (§ 1346 has no retroactive application). Thus, Peacock must plead facts demonstrating deprivation of a property right or interest in order to support the predicate acts of mail fraud.

We have construed Peacock's allegations with respect to the mail fraud scheme liberally, taking into account all possible targets of the alleged scheme as well as the fact that a property interest need not be "tangible" to satisfy *McNally. See Carpenter,* 484 U.S. at 25, 108 S.Ct. at 320; *Wallach,* 935 F.2d at 461. Nowhere do we find support for the requirement that MAJ's alleged scheme had as its object the deprivation of a property right.

We begin with Peacock's apparent attempt to assert that the *Copyright Office* was defrauded of property, by stating that each of MAJ's mailings constituted a " 'scheme or artifice to defraud the Register of Copyrights and the Library of Congress to obtain for MAJ the valuable property of a United States copyright registration....' " ¶ 132. In evaluating the sufficiency of that allegation, we consider *McNally*'s requirement that "any benefit

which the Government derives from the [mail fraud] statute must be limited to the Government's interests as property holder." 483 U.S. at 359 n. 8, 107 S.Ct. at 2881 n. 8. In order for such a scheme to come within the purview of the mail fraud statute, therefore, the Register of Copyrights must have a property interest in the copyright registrations it disburses.

Evaluating Peacock's contention in light of several Second Circuit decisions exploring the scope of the Government's interest as a property holder, we reject the notion that the Register of Copyrights has any such property interest. In *United States v. Evans,* for example, the Second Circuit addressed a scheme to deceive the United States about the true destination of arms sold to Iran. According to the mail and wire fraud counts of the indictment, the Government contended that the "property" at issue were the arms themselves, and that the Government's property interest was the ability to control the transfer of the arms to foreign nations. The Court rejected the notion that the Government had any property interest in the arms, however, finding that because it neither manufactured nor owned them, its interest was only "ancillary to a regulation, not to property." *Evans,* 844 F.2d at 40–42. In *Corcoran v. American Plan Corp.,* similarly, the Second Circuit determined that the New York State Superintendent of Insurance, as regulator of the insurance industry, had no property interest in money stolen from private insurance companies. 886 F.2d at 16, 20–21.

The situation presented by Peacock's alleged scheme to defraud is analogous. While the Register of Copyrights does have an interest in regulating the intellectual property rights of private parties, it has no property interest of its own in either the matter underlying the copyright or in the copyright registration once issued. As such, Peacock's mail fraud acts cannot be predicated on any scheme to deprive the Register of Copyrights of money or property.

12. Section 1346 provides, "For purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

We next consider the possibility that *Peacock* was deprived of a property interest by MAJ's alleged scheme to defraud. At first glance, this possibility seems plausible, in that Peacock contends that MAJ's actions deprived it of the right to manufacture and sell charms designs purchased from the Old Mr. Craftsman. *See* ¶¶ 105–06. The difficulty with this position, however, is that Peacock has nowhere alleged that it held any property right, such as its own copyright or licensing arrangement, in the charms at issue. Instead, Peacock's own pleading describes the scheme as one to procure fraudulent copyrights in charm designs "that were *rightfully in the public domain, and should be free to all.*" ¶ 159 (emphasis added).

In short, Peacock's amended countercomplaint fails to demonstrate that the allegedly fraudulent scheme had as its object the deprivation of any property interest. The "right" to be free from fraudulent competition is not a cognizable property right for these purposes. Peacock's mail fraud allegations are deficient and the asserted violations of the mail fraud statute cannot serve as predicate acts. Moreover, because Peacock has failed to plead properly a single predicate act, the RICO counterclaim is dismissed, without prejudice to repleading as will be discussed in greater detail in Part III *infra*.[13]

3. The Lanham Act Counterclaim.

▮▮▮ In the amended countercomplaint, Peacock for the first time asserts a violation of the false advertising prong of the Lanham Act. That statute subjects to civil liability:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities....

15 U.S.C. § 1125(a)(2). Peacock claims that MAJ has misrepresented the "nature, characteristics [and] qualities" of its goods by falsely representing that it "is the sole and lawful proprietor of the copyrights in various public domain works" (¶ 186). Peacock further alleges that it has been damaged by these misrepresentations in that customers who "have received MAJ's claims of originality and exclusivity" will not buy the same charms from MAJ's competitors "because they will believe that the competitors are engaged in 'knocking off' MAJ's copyrights" (¶ 161).

Although MAJ attacks the sufficiency of the Lanham Act claim on a number of fronts, its primary objection is that Peacock has failed to allege that Michael Anthony has made false statements about its products. Because Peacock concedes that MAJ holds copyright registrations for the charm designs at issue, MAJ contends that any "advertisement" regarding those registrations could not possibly be deemed false.

Despite the surface logic of MAJ's contentions, there is authority for the proposition that a false designation of copyright may constitute a "false designation of origin" or "false description or representation" that is actionable under the Lanham Act. *See Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 37 (2d Cir. 1982); *Sunset Lamp Corp. v. Alsy Corp.*, 698 F.Supp. 1146, 1153 (S.D.N.Y.1988).[14]

---

**13.** MAJ's memoranda of law attacked the RICO counterclaim on a number of additional grounds, including a claim that it was barred by the statute of limitations and that any injury deriving from the alleged provision of cocaine and prostitutes to MAJ's customers was insufficient to confer standing on Peacock. *See* MAJ's Supplemental Memorandum in Support of Motion to Dismiss at 16–17. Because we have found many of the RICO allegations inadequate and have dismissed the counterclaim for failure to plead the requisite predicate acts, we decline to reach these objections unless and until Peacock submits an amended pleading.

**14.** The case of *Kregos v. Associated Press*, 937 F.2d 700 (2d Cir.1991), cited by MAJ, is not to the contrary. Although the *Kregos* Court affirmed the dismissal of a Lanham Act violation based on the plaintiff's claim that the defendant placed its own copyright notice on an allegedly

While Peacock might be able to state a claim under the Lanham Act in theory, however, its present allegations are insufficient for the simple reason that they fail to state that MAJ has *advertised* its copyright in any commercially noticeable manner. The amended countercomplaint does not state where the copyright notice was placed on the charms, whether it was large enough to be seen by consumers, or whether it was actually seen by any consumers. Nor does it mention any formal advertising campaigns or marketing material that emphasized the charms' copyrights or billed them as "original." Under such circumstances, we find it difficult to discern a claim that MAJ has engaged in "false advertising" within the meaning of the Lanham Act.

Despite these apparent deficiencies, Peacock's counsel has suggested in statements outside the pleadings that such an advertising campaign was conducted. During oral argument on November 21, 1991, for example, he made reference to a print advertisement involving one of the charms in dispute, in which MAJ represents that the charm design is copyrighted and original to MAJ. *See* November Transcript at 31. In light of the fact that Peacock may be able to assert a viable Lanham Act violation by including these unpleaded allegations, we dismiss the Lanham Act counterclaim at this time, but with leave to replead.

### 4. The Unfair Competition Counterclaim.

■■■ Peacock's final counterclaim is for unfair competition under New York law. This counterclaim is based on MAJ's allegedly improper placement of copyright notices on goods in the public domain (¶ 190) and on its alleged provision of prostitutes and cocaine to customers and employees (¶ 191).

In arguing that this counterclaim should be dismissed, MAJ contends that even if Peacock's allegations were proven, they would not constitute unfair competition. Specifically, MAJ argues that the tort of unfair competition requires the "passing off" of a defendant's product as plaintiff's own, or at least the misappropriation of a "property interest" held by the plaintiff.

We first address the sufficiency of Peacock's claims regarding the alleged copyright misuse. With respect to those claims, MAJ reiterates an argument made in connection with the mail fraud allegations: that because Peacock claims an interest only in charm designs in the public domain, it has failed to allege any property right misappropriated by MAJ's actions.

MAJ is certainly correct that "[a]n unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." *Roy Export Co. Establishment v. Columbia Broadcasting Sys., Inc.,* 672 F.2d 1095, 1105 (2d Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *see also Metropolitan Opera Assoc. v. Wagner–Nichols Recorder Corp.,* 199 Misc. 786, 101 N.Y.S.2d 483, 489 (Sup.Ct. N.Y. County 1950), *aff'd,* 279 A.D. 632, 107 N.Y.S.2d 795 (App.Div.1951). MAJ's error, however, is in its overly restrictive definition of "property" as it has developed in connection with the tort of unfair competition. Unlike the stringent "money or property" requirement under the federal mail fraud statute, New York Courts and federal courts construing New York law apply a broad definition of property rights to unfair competition claims. As the New York Court of Appeals stated in *Fisher v. Star Company:*

> The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right; and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right

infringing good, it made clear that its decision was based on the plaintiff's failure to allege that the defendant's copyright notice was false or that the underlying matter "originated from any source other than [the defendant]." *Id.* at 710–

11. In this case, by contrast, Peacock's pleadings are replete with allegations that MAJ's copyright registrations were fraudulently obtained and that MAJ copied the copyrighted matter rather than creating it independently.

to guard property already acquired. It is this right that furnishes the basis of the jurisdiction in the ordinary case of unfair competition.

231 N.Y. 414, 132 N.E. 133, 137–38 (N.Y. 1921) (quoting *International News Serv. v. Associated Press*, 248 U.S. 215, 234 & 236, 39 S.Ct. 68, 70–71 & 71, 63 L.Ed. 211 (1918)). In conformity with that broad approach, subsequent courts have determined that any misappropriation of the "skill," "labors," or "expenditures" of another may constitute unfair competition, provided the misappropriation is in bad faith. *See, e.g., Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980); *Alusit Ltd. v. Aluglas of Pennsylvania*, No. 89–3849, 1990 WL 209422, at *11, 1990 U.S. Dist LEXIS 16755, at * 33 (S.D.N.Y. Dec. 4, 1990).

Peacock's amended countercomplaint alleges that Peacock purchased charm molds from the Old Mr. Craftsman and thereafter expended money and effort manufacturing the charms and preparing catalogs for their sale. The countercomplaint further alleges that when Peacock attempted to sell those charms and reap the fruits of its labor, it was confronted with a lawsuit by MAJ, which had copied the charms and fraudulently obtained copyrights in the interim. Regardless of whether or not those charms were in the public domain, we find that this alleged misappropriation of Peacock's labor and investment supports a claim of unfair competition under New York law.

Peacock's allegations with respect to the provision of cocaine and prostitutes, however, pose an entirely different situation. Peacock asserts that this conduct may be labeled unfair competition because it is "unfair," and insists that the tort is designed to protect against all forms of "commercial immorality." *See, e.g., Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 710 (2d Cir.1982). While the tort is undoubtedly a broad one, which one Court has described as "adaptable and capacious," *Roy Export*, 672 F.2d at 1105, it is by no means all-encompassing and courts have not hesitated to recognize its limits. *See, e.g., Saratoga Vichy Spring*

*Co., Inc.*, 625 F.2d at 1044; *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 842 (2d Cir.1980). Peacock has failed to cite any case in support of its claim that the provision of cocaine or prostitutes constitutes unfair competition under New York law. In light of that deficiency, as well as the fact that we cannot see how the provision of such inducements constitutes a misappropriation of Peacock's "skill," "labors" or other property rights, we conclude that these allegations may not serve as a basis for Peacock's unfair competition claim.

## III. CONCLUSION

As the above discussion reflects, Peacock's motion to join Michael and Anthony Paolercio as counter-defendants is granted, subject to a post-discovery motion to dismiss as to the non-RICO claims. MAJ's motion to dismiss the antitrust counterclaims and the claim of unfair competition is denied, although Peacock may not assert the alleged unlawful inducements as a basis for the latter claim. MAJ's motion to dismiss the RICO and Lanham Act counterclaims is granted, although Peacock will be given leave to replead them, except with regard to the predicate acts of mail fraud.

With respect to the issue of repleading, this Court is aware that Peacock has already been given one opportunity to clarify the counterclaims and has nonetheless failed in many instances to conform even to the pleading requirements of Fed.R.Civ.P. 8. Despite that history, we will permit Peacock one further opportunity to redress the deficiencies in its countercomplaint, assuming, of course, that there is a factual basis for it to do so. Peacock is to file its amended countercomplaint, if any, by June 29, 1992. The parties are to confer and to submit to the Court by July 13, 1992 a proposed schedule for the completion of all discovery and submission of a pretrial order.

SO ORDERED.