FEDERAL TRADE COMMISSION,
Plaintiff,

v.

MYLAN LABORATORIES, INC., Cambrex Corp., Profarmaco S.R.L., and Gyma Laboratories of America, Inc., Defendants.

The State of Connecticut,
et al., Plaintiffs,

v.

Mylan Laboratories, Inc., Cambrex Corp., Profarmaco S.R.L., Gyma Laboratories of America, Inc., and SST Corp., Defendants.

Nos. 98–3114 (TFH), 98–3115(TFH).

United States District Court,
District of Columbia.

July 7, 1999.

Richard A. Feinstein, Bureau of Competition, Federal Trade Competition, Washington, DC, for Plaintiffs.

Steven A. Newborn, Rogers & Wells, Washington, DC, for Mylan Laboratories, Inc.

Bertram W. Rein, Wiley, Rein & Fielding, Washington, DC, for U.S. Chamber of Commerce.

Ann M. Ashton, Jonathan M. Tuttle, Debevoise & Plimpton, Washington, DC, for Cambrex.

Peter Dean Isakoff, Weil, Gotshal & Manges, Washington, DC, for Gyma Laboratories.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

The above-captioned cases are actions by the Federal Trade Commission (FTC) and thirty-two States against Mylan Laboratories and other drug companies for various federal and state law antitrust violations. Pending before the Court are defendants' motions to dismiss the complaints in both cases. There are three motions to dismiss pending in *FTC v. Mylan* and three pending in *State of Connecticut v. Mylan.* Defendants argue both that plaintiffs have not stated a claim upon which relief can be granted, and that this Court lacks subject matter jurisdiction over certain aspects of the complaints. For the reasons set forth below, defendants' motions will be granted in part and denied in part.

## I. BACKGROUND

### A. Legal Framework

The first action is brought by the Federal Trade Commission ("FTC") under § 13(a) of the Federal Trade Commission Act, 15 U.S.C. § 53(a) ("FTC Act"), to secure a permanent injunction and other relief against the defendants. Defendants are Mylan Laboratories, Inc., Cambrex Corporation, Profarmaco S.R.L. and Gyma Laboratories of America, Inc. The FTC alleges that the defendants engaged and are engaging in unfair methods of competition in or affecting commerce in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a). The Complaint contains eight counts of unfair competition.[1] The relief sought by the FTC is for the Court to (1) find that the defendants have violated § 5(a) of the FTC Act; (2) permanently enjoin the defendants from engaging in such conduct; (3) rescind the defendants' unlawful licensing arrangements; and (4) order other equitable relief, including the disgorgement of $120 million plus interest.

The second case, *State of Connecticut v. Mylan Labs,* is an action brought by thirty-two states against defendants for violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as well as various state antitrust laws. Plaintiffs bring the action as *parens patriae* on behalf of natural persons; on behalf of their state's general economies in their sovereign capacities; and as injured purchasers or as reimbursers under state Medicaid and other programs. The defendants are the same as in *FTC v. Mylan Labs,* except that the State complaint names an additional defendant, SST Corporation. The substantive allegations contained in the State complaint are identical to those in the FTC complaint, except that the State complaint contains an additional ninth count alleging that Mylan and SST entered into an illegal price-fixing agreement. As relief, the States are requesting that the Court (1) find that the defendants have violated §§ 1 and 2 of the Sherman Act; (2) permanently enjoin the defendants from engaging in such conduct; (3) rescind the defendants' unlawful licens-

---

1. The eight counts are for monopolization, attempted monopolization, conspiracy to monopolize, and unlawful restraint of trade. If proven, these counts constitute violations of § 5 of the FTC Act, which prohibits "violations of the Clayton and Sherman Antitrust Acts." *Times–Picayune Publ'g Co. v. United States,* 345 U.S. 594, 609, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

ing arrangements; and (4) award treble damages; (5) award appropriate relief under the state statutes; and (6) order other equitable relief under federal law, including disgorgement and restitution.

The defendants have filed motions to dismiss in both cases.[2] The six motions are:

1. Defendants' motion to dismiss the FTC's amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6);

2. Defendants' motion to dismiss the FTC's amended complaint in part pursuant to Fed.R.Civ.P. 12(b)(6);

3. Gyma Corporation's motion to dismiss the FTC's amended complaint pursuant to Fed.R.Civ.P. 12(b)(6);

4. Defendants' motion to dismiss the States' amended complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6);

5. Defendants' motion to dismiss the States' amended complaint pursuant to Fed.R.Civ.P. 12(b)(6);

6. Gyma Corporation's motion to dismiss the FTC's amended complaint pursuant to Fed.R.Civ.P. 12(b)(6).

After briefly reviewing the factual background of these cases, the Court will address each of defendants' motions.

### B. Facts

For purposes of the instant motions to dismiss, the allegations of the complaints are taken as true. The facts below are presented accordingly, and do not constitute factual findings.

These cases concern the generic drug industry. Generic drugs, which are chemically identical versions of branded drugs, cannot be marketed until after the patent on the branded drugs has expired. Firms that manufacture and market generic drugs often specialize in such drugs, although Mylan manufactures both generic and branded drugs. Generic drugs are sold at substantial discounts from the price of branded drugs.

Mylan and other generic drug manufacturers require the approval of the Food and Drug Administration (FDA) to market a generic product in the United States. For each generic drug, the manufacturer must file an Abbreviated New Drug Application (ANDA) with the FDA to establish that its version of the drug is therapeutically equivalent to the branded drug. FDA approval of an ANDA takes an average of about 18 months. .

Typically, the generic manufacturer purchases the Active Pharmaceutical Ingredient (API) from a specialty chemical manufacturer (API Supplier). The generic manufacturer combines the API with inactive filters, binders, colorings and other chemicals to produce a finished product. To sell an API in the United States, the API supplier must file a Drug Master File (DMF) with the FDA. The DMF explains the processes that the API supplier uses to make the API and to test chemical equivalence and bioequivalence to the brand product. To use an API, the generic manufacturer's ANDA must refer to the API supplier's DMF filed with the FDA. More than one drug manufacturer can reference the DMF of the same API supplier. A generic manufacturer that wants or needs to change its API supplier must obtain FDA approval of an ANDA supplement which includes a reference to the new supplier's DMF and test results regarding the generic manufacturer's product using the new API. This process averages about 18 months, though it can take as long as three years.

Lorazepam and clorazepate are two of the approximately 91 generic drugs that Mylan currently manufactures and sells in tablet form. Lorazepam is used to treat anxiety, tension, agitation, insomnia, and

---

**2.** In addition, the United States Chamber of Commerce has filed a brief *Amicus Curiae* supporting defendants' motion to dismiss the FTC's amended complaint pursuant to Fed. R.Civ.P. 12(b)(1) and 12(b)(6).

as a preoperative sedative. Doctors issue over 18 million prescriptions a year for lorazepam tablets. Because lorazepam is used to treat chronic conditions and is heavily prescribed for nursing home and hospice patients, lorazepam users tend to stay on the drug for long periods of time. Clorazepate is used to treat anxiety and in adjunct therapy for nicotine and opiate withdrawal. Doctors issue over three million prescriptions a year for clorazepate tablets.

Profarmaco (which is a wholly owned subsidiary of Cambrex) manufactures APIs in Italy. Profarmaco holds DMFs for lorazepam API and clorazepate API, and has supplied such APIs to drug manufacturers in the United States. Foreign firms, like Profarmaco, that supply APIs to the United States typically have distributors in the United States who purchase APIs and resell them to generic drug manufacturers in the United States. Mylan purchases its lorazepam and clorazepate API from Gyma, Profarmaco's U.S. distributor of these products. Several other drug manufacturers have purchased API from SST Corporation, another U.S. distributor of this product.

The plaintiffs in these two cases allege the following anti-competitive conduct on the part of the defendants. Mylan sought from its API suppliers long-term exclusive licenses for the DMFs of certain APIs selected because of limited competition. If Mylan obtained such an exclusive license, no other generic drug manufacturer could use that supplier's API to make the drug in the U.S. Mylan sought exclusive licenses for the DMFs for lorazepam API and clorazapate API as well as one other drug not the subject of these lawsuits.

Mylan entered into contracts with Profarmaco and Gyma such that these companies would license exclusively to Mylan for 10 years. The exclusive licenses would provide Mylan with complete control over Profarmaco's entire supply of lorazepam API and clorazapate API entering the U.S. With complete control of Profarmaco's

supply of these products and by refusing to sell to any of its competitors, Mylan would deny its competition access to the most important ingredient for producing lorazepam and clorazapate tablets.

In return for the 10-year exclusive licenses, Mylan offered to pay Cambrex, Profarmaco and Gyma a percentage of gross profits on sales of lorazepam and clorazapate tablets, regardless of who Mylan purchased the API from. Mylan also tried to execute an exclusive licensing arrangement with SST for control of its lorazepam supply. This is significant because Mylan was not authorized by the FDA to sell lorazepam manufactured with SST API (i.e. Mylan's ANDA did not reference SST's DMF). Thus, the States allege that Mylan was entering into a deal for exclusive rights even though it would not have been able to use SST API until after an ANDA Supplement had been completed, which usually takes around 18 months. The plaintiffs' argue that Mylan's attempt to obtain control over SST's supply, when Mylan could not even use SST API, demonstrates the anti-competitive nature of Mylan's actions.

On or around January 12, 1998, Mylan raised its price of clorazepate tablets to State Medicaid programs, wholesalers, retail pharmacy chains and other customers by amounts ranging approximately from 1,900 percent to over 3,200 percent, depending on the size of the bottle and the strength. On March 3, 1998, Mylan raised its price of lorazepam tablets by amounts ranging from approximately 1,900 to 2,600 percent. Shortly thereafter, SST raised the price of lorazepam API by approximately 19,000 percent. SST sold the lorazepam API to Geneva, one of Mylan's competitors, which raised its prices to approximately the price of Mylan's tablets.

The FTC brought its action on December 21, 1998, and filed an amended complaint ("FTC Compl.") on February 9, 1999. Fifteen states, by their respective attorney generals, filed an action under

§§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and their respective state statutes against the defendants and SST Corporation on December 22, 1998. These states, together with 17 other states, filed an amended complaint ("State Compl.") on February 8, 1999. As noted above, the substantive allegations are substantially identical to those of the FTC complaint, except that the State complaint alleges that defendants and SST, another distributor of APIs, conspired to raise and stabilize the price of lorazepam API. *See* State Compl. ¶¶ 35, 38, 44, 55–70, 85–88.

## II. DISCUSSION

### A. Standard of Judgment

Under Fed.R.Civ.P. 12, a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In evaluating plaintiffs' complaints, the Court must accept the factual allegations as true and draw reasonable inferences therefrom in favor of plaintiffs. *Square D. Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 411, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986).

### B. FTC v. Mylan Labs

#### 1. Defendants' Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6)

Defendants have moved to dismiss the complaint in the FTC Action because of a lack of subject matter jurisdiction. *See* Fed.R.Civ.P. 12(b)(1). According to defendants, this Court lacks subject matter jurisdiction under § 13(b) of the FTC Act for two reasons: (1) § 13(b) does not authorize the FTC to seek a permanent injunction in an antitrust case such as this one; and (2) § 13(b) does not permit monetary relief such as the disgorgement of profits sought in this case. These claims are addressed in turn.

#### a. Permanent Injunction

■ The first issue is whether § 13(b) of the FTC Act permits the FTC to seek a permanent injunction in an antitrust case. Section 13(b) states:

Temporary restraining orders; preliminary injunctions

(b) Whenever the Commission has reason to believe-

(1) that any person, partnership or corporation is violating, or is about to violate any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public-

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however*, That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business...

15 U.S.C. § 53(b). The FTC argues that the final proviso (the "permanent injunction proviso") provides it with the authori-

**36**

ty to seek a permanent injunction in antitrust cases. Defendants, on the other hand, contend that this is not a "proper case" within the meaning of the proviso, and that this Court lacks jurisdiction to issue a permanent injunction in an action brought by the FTC.

The FTC's authority to pursue an injunction in antitrust cases was considered by this Court in *FTC v. Abbott Laboratories*, 1992 WL 335442, 1992–2 Trade Cas. ¶ 69,996 (D.D.C.1992) (Gesell, J.) *dismissed on other grounds*, 853 F.Supp. 526 (D.D.C.1994). In that case, the Court permitted the FTC to pursue a permanent injunction in an antitrust case and rejected the argument that preliminary relief only was available under § 13(b). *Id.* at 68,833. The Court held that the permanent injunction proviso applies to "any provision of law" enforced by the Commission and then concluded that the antitrust case at issue, involving a price fixing conspiracy, "fell squarely within the jurisdiction of the Commission's law enforcement responsibilities" under § 5 of the FTC Act. *Id.*

This Court can find no reason to depart from the *Abbott Labs* holding. Defendants attempt to distinguish *Abbott Labs* on the ground that it involved a *per se* antitrust violation (i.e. a price fixing agreement), instead of a "rule of reason" antitrust violation, but this argument is unconvincing. Although the permanent injunction proviso speaks of "proper cases," there is nothing in the statute, regulations or case law restricting the statutory term "proper cases" to *per se* violations of the antitrust laws. Indeed, several courts have explicitly rejected such narrowing constructions. *See, e.g., FTC v. Evans Products Company*, 775 F.2d 1084, 1087 (9th Cir.1985) (holding that the FTC may proceed under § 13(b) for any violation of a statute administered by the FTC); *FTC v. H.N. Singer*, 668 F.2d 1107, 1111 (9th Cir.1982) (stating that "the district court has the power to issue a permanent injunction to enjoin acts or practices that violate the law enforced by the Commission."); *FTC v. Virginia*

*Homes Mfg. Corp.*, 509 F.Supp. 51, 54 (D.Md.) *aff'd*, 661 F.2d 920 (4th Cir.1981). Accordingly, this Court finds that the permanent injunction proviso may be used to enjoin violations of "any provision of law" enforced by the FTC. 15 U.S.C. § 53(b)(1). Because § 5 of the FTC Act is a "provision of law enforced by the Federal Trade Commission," § 13(b) allows this Court to issue a permanent injunction. Defendants' motion is therefore denied on this issue.

*b. Monetary Relief*

■ The second issue is whether the FTC may pursue monetary relief in this action. In addition to an injunction prohibiting defendants' conduct and rescission of defendants' unlawful licensing arrangements, the FTC asks this Court to "order other equitable relief, including the disgorgement of $120 million plus interest." FTC Compl. at 22, ¶ 4. Defendants object to the FTC's request on the ground that § 13(b) does not authorize disgorgement or any other form of monetary relief.

It is true that the plain language of § 13(b) does not authorize the FTC to seek monetary remedies. *See* 15 U.S.C. § 53(b). The FTC argues, however, that monetary relief is a natural extension of the remedial powers authorized under § 13(b). Although courts are generally disinclined to find remedies beyond those that Congress has expressly granted, the equitable jurisdiction of a federal agency such as the FTC must be read in light of the principles articulated in *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). In that case, the Supreme Court upheld the district court's authority to refund the illegal rent overcharges pursuant to § 205(a) of the Emergency Price Control Act of 1942, which expressly granted only the power to enjoin illegal practices. The Court wrote:

[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. And since the public interest is involved in a proceeding of this nature,

those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. Power is thereby resident in the District Court, in exercising this jurisdiction, "to do equity and to mould each decree to the necessities of the particular case."

*Id.* at 398, 66 S.Ct. 1086 (*quoting Hecht Company v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944)) (citation omitted). The *Porter* Court went on to state:

> [T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words or by a necessary and inescapable inference restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. "The great principles of equity, securing complete justice, should not be yielded to light inferences or doubtful conclusions."

*Id.* (*quoting Brown v. Swann*, 35 U.S. (10 Pet.) 497, 9 L.Ed. 508). The Supreme Court affirmed the *Porter* principle in *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 291–92, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960). The Court wrote:

> When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. As this Court long ago recognized, 'there is inherent in the Courts of Equity a jurisdiction to...give effect to the policy of the legislature.' *Clark v. Smith*, 38 U.S.(13 Pet.) 195, 203, 10 L.Ed. 123.

*Id.*

Based on the principle of statutory construction set forth in *Porter* and reaffirmed in *DeMario*, five courts of appeals and numerous district courts have permitted the FTC to pursue monetary relief under § 13(b). *See FTC v. Febre*, 128 F.3d 530, 534 (7th Cir.1997); *FTC v. Gem Merchandising*, 87 F.3d 466, 470 (11th Cir.1996); *FTC v. Pantron*, 33 F.3d 1088, 1102 (9th Cir.1994); *FTC v. Security Rare Coin*, 931 F.2d 1312 (8th Cir.1991); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982); *see also Federal Trade Commission v. R.A. Walker & Assocs.*, No. 83–2138, 1991 WL 185162, 1991 U.S. Dist. LEXIS 14114 (D.D.C. July 26, 1991). Although the precise form of monetary relief differs among the cases, *compare Security Rare Coin*, 931 F.2d at 1316 (restitution) *with Southwest Sunsites*, 665 F.2d at 718 (asset freeze pending further proceedings), at least one court has upheld the FTC's ability to seek disgorgement in the courts. *See Gem Merchandising*, 87 F.3d at 470 ("We conclude that section 13(b) permits a district court to order a defendant to disgorge illegally obtained funds"). As defendant cites no relevant case law that prohibits the FTC from seeking disgorgement or any other form of equitable ancillary relief, the Court denies defendants' motion on this issue.

## C. State of Connecticut v. Mylan Labs

### 1. Defendants' Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6)

This motion seeks to dismiss the State complaint insofar as the complaint asserts improper legal theories and requests for relief. Defendants' claims are that: (1) the States' request for monetary relief based on purchases from suppliers other than Mylan is not authorized under federal antitrust law; (2) the States' request for restitution and/or disgorgement should be dismissed because it is not authorized by Section 16 of the Clayton Act and it conflicts with the detailed scheme of antitrust remedies enacted by Congress, as well as the principles enunciated in *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977); and (3) many of the supplemental state law claims must be dismissed because the state statutes do not permit injunctive and/or monetary relief

under the facts of this case. These claims are considered in turn.

### a. "Umbrella Liability"

■ The State complaint seeks to recover damages not only for direct purchases from Mylan, but also for purchases from Mylan's competitors. *See* State Compl. ¶ 50. The premise of the States' request is that Mylan's competitors in the generic drug industry, though not parties to the exclusive licenses nor members of the alleged conspiracy, raised their prices as a consequence of Mylan's actions. The States argue that defendants should be liable for the difference between the prices charged by Mylan's competitors and what those prices would have been had Mylan not raised its prices pursuant to an illegal agreement.

The "price umbrella" theory of antitrust liability presented by the States has not been considered by this Circuit or the Supreme Court. Three circuits have addressed this theory. In *Mid–West Paper Products Co. v. Continental Group Inc.*, 596 F.2d 573 (3d Cir.1979), the Third Circuit held that the antitrust plaintiffs in that case did not have standing to seek relief for purchases from non-conspirators. The court rejected the umbrella theory for three reasons. First, the court found that ascertaining damages under such a theory would be "highly conjectural," as the court would need to estimate what portion of the non-conspirators' price increases was attributable to market forces and what portion was fueled by the defendants' anti-competitive conduct. *Id.* at 584–85 ("it cannot readily be said with any degree of economic certitude to what extent, if indeed at all, purchasers from a competitor

of the price-fixers have been injured by the illegal overcharge."). Second, the court found that determining the effect of defendants' overcharges upon their competitors' prices would transform the litigation into the sort of complex economic proceeding that the Supreme Court in *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), counseled courts to avoid.[3] *Id.* at 585. Finally, the court wrote that permitting a purchaser from a competitor of the defendants to sue the defendants for treble damages was incompatible with the antitrust goal of maintaining a competitive economy. *Id.* at 586. For these reasons, the court held that purchasers from competitors of price-fixing defendants may not seek damages under an umbrella theory of liability.

The Fifth Circuit reached the opposite conclusion regarding umbrella liability in *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir.1979), *cert denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). The *Beef Industry* court addressed the umbrella theory in a footnote, which states that an umbrella-type injury (i.e. paying higher prices due to "price following" by non-conspirators) "satisfies the test for proximate causation." *Id.* at 1166 n. 24. Accordingly, the *Beef Industry* court held that the antitrust plaintiffs in that case had standing to sue the defendants for purchases from non-conspirators.

Three years after *Mid–West Paper* and the beef industry litigation, the Ninth Circuit addressed the umbrella theory in *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 691 F.2d 1335 (9th Cir.1982).[4] The *Petro-*

---

**3.** For a complete discussion of *Illinois Brick*, see *infra* at 41.

**4.** Of the district courts to consider the issue, at least five courts found it appropriate to hold a defendant liable under an umbrella theory while two other courts have denied such relief. *Compare In re Arizona Dairy Products Litig.*, 627 F.Supp. 233, 236 (D.Ariz. 1985); *In Re Uranium Antitrust Litig.*, 552 F.Supp. 518, 525 (N.D.Ill.1982); *Pollock v.*

*Citrus Associates of New York,* 512 F.Supp. 711 (S.D.N.Y.1981); In re Bristol Bay, Alaska, Salmon Fishery Antitrust *Litig.*, 530 F.Supp. 36 (W.D.Wash.1981); *Washington v. American Pipe & Constr. Co.*, 280 F.Supp. 802 (W.D.Wash.1968) *with In Re Folding Carton Antitrust Litig.*, 88 F.R.D. 211 (N.D.Ill.1980); *Gross v. New Balance Athletic Shoe*, Inc., 955 F.Supp. 242 (S.D.N.Y.1997) (denying plaintiffs standing to seek relief from purchases from non-conspirators).

*leum Products* court rejected the umbrella liability theory for two reasons. First, in the context of the multi-tiered scheme of distribution present in that case, the court was concerned that the umbrella theory would permit double recovery against the defendants for the effects of the same overcharge. *Id.* at 1340. For example, borrowing from the facts of that case, if a plaintiff purchased gasoline both from Standard Oil and from an independent refiner further along the chain of distribution, the umbrella theory would dictate that Standard Oil is liable to the plaintiff both for its price increase (if the result of an illegal agreement) as well as the price hike instituted by the independent refiner. In addition, however, the independent refiner could sue Standard Oil for its price increase, without reduction for the damages already awarded to the plaintiff.[5] *See id.* at 1340. The result would be to make defendants liable twice for the effects of the same overcharge.

The second basis of the *Petroleum Products* decision was that claims based on umbrella liability are "unacceptably speculative and complex." *Id.* at 1341. Echoing the *Mid–West Paper* decision, the court found that "any attempt to ascertain with reasonable probability whether the non-conspirators' prices resulted from the defendants' purported price-fixing conspiracy or from numerous other considerations" would be necessarily speculative.[6] *Id.*

In light of *Mid–West Paper* and *Petroleum Products*, the Court will grant defendants' motion to dismiss the States' complaint insofar as it seeks umbrella

damages. The main difficulty with the umbrella theory is that, even in the context of a single level of distribution, ascertaining the appropriate measure of damages is a highly speculative endeavor. There are numerous pricing variables which this Court would be bound to consider to approximate the correct measure of damages, including the cost of production, marketing strategy, elasticity of demand, and the price of comparable items (i.e. the brand versions of lorazepam and clorazepate). *See Gross v. New Balance Athletic Shoe,* 955 F.Supp. 242, 246 (S.D.N.Y.1997). (dismissing umbrella liability claims as "the causal connection between the alleged injury and the conspiracy is attenuated by significant causative factors (i.e. independent pricing decisions of non-conspiring retailers)"). The interaction of these variables is uncertain. As noted in *Hanover Shoe,* 392 U.S. at 492–93, 88 S.Ct. 2224, "[a] wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured until after the fact; indeed a businessman may be unable to state whether, had one fact been different...he would have chosen a different price." A judicial inquiry into these factors "would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings[.]" *Illinois Brick,* 431 U.S. at 732, 97 S.Ct. 2061. Accordingly, this Court will decline the States' invitation to consider umbrella damages and dismiss the States' complaint insofar as it requests such relief.

---

5. Although Standard Oil might argue that the independent refiner was not injured by the antitrust violation because the independent refiner passed the price increase along to its customers (such as the plaintiff), this defense was rejected as a matter of law by the Supreme Court in *Hanover Shoe, Inc. v. United Machinery Corp.,* 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968).

6. The *Petroleum Products* court expressly reserved judgment on the application of the umbrella theory to the kind of facts present

here. The court wrote: "[w]e need not decide...whether, in a situation involving a single level of distribution, a single class of direct purchasers from non-conspiring competitors of the defendants can assert claims for damages against price-fixing defendants under an umbrella theory." *Id.* at 1340. Nevertheless, a principle concern of the *Petroleum Products* court—the speculative nature of umbrella damages—is also applicable to cases involving a single level of distribution.

### b. Restitution/Disgorgement

■ Defendant's next argument is that the States cannot sue for restitution and disgorgement under § 16 of the Clayton Act. Section 16 states that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief...against threatened loss or damage by a violation of the antitrust laws...when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26. Defendants argue that restitution and disgorgement are retrospective remedies for past conduct, not relief against "threatened" conduct.

The sole opinion addressing restitution and/or disgorgement under § 16 is from a 1976 case in the Ninth Circuit, *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 233–34 (9th Cir.1976). In that case, twenty-two states, as well as other plaintiffs, sued four automobile manufacturers for allegedly suppressing the development of automobile antipollution technology and thereby eliminating competition in the research and development of automobile pollution control devices. In addition to an order requiring the automobile manufacturers to "retrofit" all automobiles produced by the defendants that did not have pollution control devices, the plaintiffs sought restitution for those persons who had already paid to have pollution devices installed on their own cars.

The Ninth Circuit upheld the district court's dismissal of the action on the basis that restitution was not an available remedy under § 16 of the Clayton Act. In a somewhat confusing opinion, the court first upheld the district court's dismissal based on the plain language of § 16. The court stated:

> While restitution is indeed an equitable remedy, § 16 limits the equitable remedies available under its terms to those against "threatened loss or damage." Here, the "reimbursement" would be awarded for the loss which has already

occurred, at the time the car owner paid to have his vehicle retrofitted; it would not be relief "against threatened loss or damage." Recovery for past losses is properly covered under § 4; it comes under the head of "damages."

*Id.* at 234. Following that holding, however, the court questioned the need for its legal conclusion by distinguishing the relief sought by the states from restitution in the "usual" sense. The court went on:

> What plaintiffs seek is not "restitution" in the sense in which that term is usually used. Defendants have not received from the car owners any money to which they are not entitled; plaintiffs do not claim that they have. Thus, whether payments which appellants seek for some of their citizens is "equitable" or not is of no consequence because § 16 does not allow the claimed relief for past loss.

*Id.* This language suggests that a typical restitution or disgorgement scenario might fit within the contours of § 16, such as where plaintiffs seek to deprive antitrust violators of the benefits of their illegal conduct. Unlike the automobile manufacturers in *Multidistrict Vehicle*, such defendants have "received...money to which they are not entitled..." *Id.*

The Supreme Court addressed the remedies available under § 16 in *California v. American Stores Co.*, 495 U.S. 271, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990). In that case, the Court considered whether divestiture is a form of injunctive relief authorized by § 16. The case involved a merger between the first and fourth largest supermarkets in California. California sued under § 7 of the Clayton Act, alleging that the merger constituted an anticompetitive acquisition that would harm consumers throughout the State. The district court granted the state a preliminary injunction requiring the defendants to operate the acquired stores separately pending the outcome of the suit. The defendants appealed, contending that the

"indirect divestiture" effected by the preliminary injunction was outside the district court's jurisdiction under § 16 of the Clayton Act. The Court of Appeals for the Ninth Circuit agreed with the defendants and reversed the district court.

On appeal from the Ninth Circuit, the Supreme Court held that divestiture is a form of injunctive relief within the meaning of § 16. The *American Stores* Court found that § 16's requirement of "threatened loss or damage" was "unquestionably satisfied" because of the economic harm threatened by the allegedly illegal merger. *Id.* at 282, 110 S.Ct. 1853. The Court based its holding on the plain language of § 16, finding that "the literal text of § 16 is plainly sufficient to authorize injunctive relief, including an order of divestiture, that will prohibit [defendants'] conduct from causing that harm." *Id.* at 283, 110 S.Ct. 1853. Additionally, the Court reasoned that divestiture decrees are consistent with § 16's "statutory context" because of § 7's "relatively expansive definition of antitrust liability." *Id.* at 284, 110 S.Ct. 1853.

Although *American Stores* is capable of broad application,[7] the opinion must be read in light of. the nature of the relief ordered by the district court in that case. The divestiture order in *American Stores* was quintessentially forward-looking: it was designed to prevent the anticompetitive harms of the merger from materializing by dissembling the merged corporation. The Court emphasized the prospective effect of divestiture in concluding that the remedy was an "appropriate means of preventing the harm" that the merger might inflict. *Id.* at 282, 110 S.Ct. 1853.

A second key distinction between the divestiture remedy authorized in *American Stores* and the disgorgement sought in this action is that divestiture does not implicate the concern for duplicative recoveries articulated by the Supreme Court in *Illinois Brick.* The *Illinois Brick* holding that indirect purchasers do not have standing under the Clayton Act rested on two considerations: first, that the addition of indirect purchasers to the litany of possible antitrust plaintiffs threatened to mire courts in unduly complicated and speculative damages proceedings; and second, that permitting indirect purchasers to sue creates a "serious risk of multiple liability for defendants." *Illinois Brick,* 431 U.S. at 730, 97 S.Ct. 2061. Although the Court's concern for the complexity of the damages proceeding is not implicated by a disgorgement action, permitting disgorgement does raise the specter of duplicative recoveries. Under the Clayton Act, private parties (including the States) can already pursue direct purchaser actions for treble damages under § 4. 15 U.S.C. § 15. In addition, the States have a cause of action for treble damages under § 4c of the Clayton Act as *parens patriae* on behalf of natural persons. *Id.* § 15c. Permitting disgorgement under § 16 would provide yet another route to defendants' allegedly ill-gotten gains, and would therefore heighten the possibility that defendants in antitrust actions could be exposed to multiple liability. While disgorgement would have the additional benefit of permitting the States to compensate indirect purchasers who are excluded from recovery under current law, the Supreme Court weighed this interest against the threat of duplicative recovery and determined that only direct purchasers have standing under the Clayton Act. *See Illinois Brick,* 431 U.S. at 741, 97 S.Ct. 2061; *see also Hawaii v. Standard Oil,* 405 U.S. 251, 264, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) (expressing unwillingness to "open the door

---

7. Most notably, *American Stores* is ambiguous on whether a court should apply the *Porter v. Warner* principle equally to actions brought by the federal government and actions brought by private parties. Although *American Stores* cites caselaw for the proposition that a court's equitable jurisdiction should be read more expansively in actions brought by government agencies, *see* 495 U.S. at 295, 110 S.Ct. 1853, the Court also cites *Porter v. Warner* in the context of § 16 of the Clayton Act, which supplies a private right of action. *Id.*

to duplicative recoveries"). The States should not be allowed to circumvent *Illinois Brick* through a novel interpretation of § 16. Accordingly, the Court will grant defendants' motion to dismiss insofar as the States seek disgorgement and/or restitution under § 16.

In light of the Court's ruling on the above issues, the States' federal claims against defendant are narrowed to the following cause of action: the States may sue the defendants under § 4 of the Clayton Act for any direct purchases that state entities or state citizens may have made of generic clorazepate and lorazepam from the defendants.[8] Defendants contend that the States' Amended Complaint fails to allege direct purchases of generic lorazepam or clorazepate tablets from Mylan, and that none of the persons on whose behalf the States purport to sue made such direct purchases from Mylan. Defendants therefore seek dismissal of the States' complaint under Rule 12(b)(6). Although defendants are correct that the States' case is dependent on facts supporting direct purchases by the States, the States have sufficiently alleged direct purchases for the purposes of a motion to dismiss. *See* State Compl. ¶¶ 7, 38, 40, 47, 50, 51. Accordingly, the Rule 12(b)(6) portion of defendants' motion is denied.

### 2. Defendant's Motion to Dismiss Under Rules 12(b)(1) and 12(b)(6)— State Law Issues

Finally, there is the issue of whether the States are entitled to the remedies they seek under the state statutes. Defendants argue that the supplemental state law claims should be dismissed to the extent that they fail to meet the requisite standing thresholds or other state law limitations on antitrust suits. Defendants offer six general arguments for why various state law claims must be dismissed. The Court will review those arguments and

then address plaintiffs' claims under the individual state statutes.

#### a. General State Law Issues

##### i. Interstate Verses Intrastate Violations

Defendants' first argument is that, as a general matter, state law challenges to the interstate conduct alleged here must be dismissed if the state law applies only to intrastate violations of law. On this point, Louisiana, South Carolina, Tennessee and Utah have determined that their state antitrust statutes apply only to violations having solely intrastate impact. This issue requires state-by-state analysis and will be discussed in the individual sections for the five above-mentioned states.

##### ii. Damages Claims For Direct Purchasers

Defendants' second argument is that, as previously discussed, damages claims for direct purchasers must be dismissed because no state specifically alleges that either it or its citizens made direct purchases of the products at issue from Mylan. This portion of defendants' motion is denied under each state law as well as under federal law as the States have adequately pleaded direct purchases for the purposes of a motion to dismiss. *See supra* at pp. 41–42. Whether the States have enough facts to support their direct purchase allegations will be determined at summary judgment.

##### iii. Umbrella Theory Damages Claims

■ Defendants' third argument is that, as discussed earlier, all damages claims based on the umbrella theory must be dismissed. Because the States do not suggest an independent state law approach to the "umbrella standing" theory and because state statutes refer to federal antitrust law for guidance, this portion of defendants' motion is granted under the state laws for the same reasons that it is granted under federal law. *See supra* at

---

**8.** In addition, all states are entitled to be in federal court to seek injunctive relief pursuant to § 16 of the Clayton Act. The Court notes that the States could also have proceeded under § 4c of the Clayton Act, but elected not to do so. *See* Oral Argument Transcript at 60.

37–40. Thus, the States' damages claims are dependant on purchases from the defendants and do not involve purchases from third party suppliers or manufacturers.

#### iv. Damages Claims On Behalf of Indirect Purchasers

■ Defendants' fourth argument is that damages claims on behalf of indirect purchasers are barred unless the state statute specifically permits recovery for indirect purchasers. Because federal antitrust law bars damages claims by or on behalf of indirect purchasers, *see Illinois Brick*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707, and because each of the States' statutes and/or case law require or prompt courts to follow federal statutes and decisions when interpreting state antitrust law, unless a state has specifically instituted a right of action for indirect purchasers, that state cannot sue on behalf of indirect purchasers. *See, e.g., Boos v. Abbott Labs.*, 925 F.Supp. 49 (D.Mass. 1996); *Stifflear v. Bristol–Myers Squibb Co.*, 931 P.2d 471 (Colo.Ct.App.1996); *In Re Wiring Device Antitrust Litig.*, 498 F.Supp. 79 (E.D.N.Y.1980). The individual state statutes are discussed below.

#### v. Restitution and/or Disgorgement on Behalf of Direct Purchasers

■ Defendants' next argument is that the States' claims for restitution or disgorgement should be dismissed unless specifically authorized by state statute. Defendants repeat arguments from their motion to dismiss the States' claims for restitution and disgorgement under § 16 of the Clayton Act. Several of the state statutes, however, are broader than the Clayton Act in this regard. Additionally, many state appellate court decisions have held that their antitrust statutes explicitly provide for restitution or that the concept of equitable relief, provided for in the statutes, includes restitution. Although Defendants state that a "federal court need not be bound by intermediate state appel-late court ruling," Def. Mem. at 50 (*citing* C.A. Wright, *Law of Federal Courts*, § 58 at 395, n. 23 (5th ed.1994)), the Court will follow state appellate court decisions on this point. *See Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177–78, 61 S.Ct. 176, 85 L.Ed. 109 (1940) ("An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination,...in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question."). Therefore, States with statutes that explicitly provide for restitution or that have been interpreted by state courts as providing such relief; States with statutes that provide for equitable relief and courts that have held the concept of equitable relief to include restitution; and States with statutes that provide, without explicit limitation, for any other equitable relief the court may order, have authority to seek restitution and disgorgement on behalf of direct purchasers under state law.

#### vi. Restitution and/or Disgorgement on Behalf of Indirect Purchasers

Defendants also argue that even those States with statutes that explicitly authorize equitable monetary relief do not authorize such relief on behalf of indirect purchasers. As discussed elsewhere in this opinion, providing monetary relief to indirect purchasers increases the risk of duplicative recovery. Therefore, restitution and/or disgorgement on behalf of indirect purchasers will be denied absent express authority for such relief under state law.

#### vi. Procedural Defects

Defendants contend that California, Colorado, Maine, Michigan and New York have failed to comply with statutory prerequisites to bringing suit. *See* Def. Mem. at 5 n. 5. The Court will not dismiss the States' claims on this basis, but will require that each of these states either comply with the procedures that are required by their individual statutes or submit to

the Court a statement as to why such procedures are not required in the instant case within ten days of the issuance of this Opinion.

### b. Individual State Law Claims

The Court will now apply the above discussion to each plaintiff State's state law claims. A summary of the Court's holding appears in the chart attached as Appendix A. Claims brought by the states of Illinois, New Mexico, South Dakota and Wisconsin as well as by the District of Columbia are uncontested. Claims brought by the State of California are contested only as to the issue of defective procedure as discussed above. The Commonwealth of Pennsylvania has not made any state law claims.

### i. Alaska

■ Defendants challenge Alaska's claim that the Monopolies Act (Alaska Stat.45.50.580) or the Unfair Trade Practices and Consumer Protection Act (Alaska Stat.45.50.501) allows the state to bring an action for restitution on behalf on indirect purchasers. Although the Monopolies Act states that "the court may make additional orders or judgments as may be necessary to restore to a person in interest any money or property...that may have been acquired by an act prohibited by AS 45.50.562 through 45.50.596," the statute fails to address the issue of restitution for indirect purchasers. Alaska cites no authority supporting restitution for indirect purchasers in an antitrust case. Moreover, it is required to interpret its antitrust statutes consistently with analogous federal law. *See West v. Whitney–Fidalgo Seafoods, Inc.*, 628 P.2d 10, 14 (Alaska 1981); Alaska Stat. § 45.550.545. As this Court has already determined that federal law does not permit private plaintiffs to sue for restitution, Alaska's claims are dismissed insofar as the state seeks disgorgement and/or restitution on behalf of indirect purchasers. Defendants do not challenge Alaska's claims for civil penalties, restitution on behalf of direct purchasers, attorney fees and costs, or preliminary or permanent injunctions, and the State has withdrawn all damages claims.

### ii. Arkansas

■ All claims brought by Arkansas under Ark.Code Ann. §§ 4–75–301, *et seq* ("the Antitrust Law") must be dismissed. The only provision Arkansas cites in support of its claims is § 4–75–310, which states that "if any person...engaged in the manufacture or sale of any article of commerce...shall, with the intent and purpose of driving out competition or for the purpose of financially injuring competitors, sell within this state at less than cost of manufacture or production or sell in such a way, or give away, in this state their productions...then the person...shall be deemed guilty of a conspiracy to form or secure a trust or monopoly in restraint of trade." The plain language of this section clearly applies to products which are sold for too little (predatory pricing), not to products such as the generic drugs in the instant case which were sold for too much. Additionally, Arkansas fails to allege that defendants have performed "within this state some act directly tending to carry into effect a conspiracy prohibited by [the statute.]." Ark.Code Ann. § 4–75–306. For these two reasons, the Court will dismiss all Arkansas Antitrust Law claims.

■ The Court will permit the State's restitution and damages claims on behalf of direct purchasers under the Arkansas Deceptive Trade Practices Act, Ark.Code Ann. § 4–88–101 *et seq.* The ADTPA gives the Attorney General express authority to seek restitution and damages for violations of the section which prohibits "unconscionable, false, or deceptive" acts. There is no support for defendants' argument that the statute does not apply to direct purchasers in this case. As discussed above, damages and restitution for indirect purchasers will be dismissed as there is no express authority for such re-

lief. Therefore, still standing are the State's claims for civil penalties, injunctive relief, restitution and damages on behalf of direct purchasers, and attorney fees and costs.

### iii. Colorado

 Defendants challenge Colorado's claim for both civil penalties and damages, and for restitution and/or disgorgement. Because the Colorado Antitrust Act plainly states that "the election by the attorney general to seek a civil penalty shall preclude the attorney general from...pursuing an action against such person for damages," Colo.Rev.Stat. Ann. § 6–4–112, and because Colorado elects to sue for damages if required to choose one of the above-stated remedies, Colorado's claim for civil penalties will be dismissed. Colorado's claim for restitution and/or disgorgement on behalf of both direct and indirect purchasers must also be dismissed because those remedies are not expressly authorized by state statute. Remaining claims include damages for direct purchasers, injunctive relief, and attorney fees and costs.

### iv. Connecticut

 The only disputed issue is whether Connecticut can seek restitution and disgorgement for indirect purchasers. Although the Connecticut Antitrust Act allows for injunctive relief, it does not provide express authority for other equitable relief such as disgorgement or restitution. Conn. Gen.Stat. § 35–34. Additionally, Connecticut courts are guided by federal court interpretations of federal antitrust statutes. Conn. Gen.Stat. § 35–44b. As discussed above, unless there is specific state authorization, States' claims for restitution or disgorgement on behalf of indirect purchasers must be dismissed. Additionally, Connecticut's claim that the Connecticut Unfair Trade Practices Act (the "CUTPA") authorizes the state to obtain restitution on behalf of indirect purchasers is without merit. While the statute does allow for restitution for direct purchasers, it nowhere addresses the issue of such relief for indirect purchasers. Because there is no state authority supporting the allegation that CUTPA remedies are available to indirect purchasers and because Connecticut antitrust law is guided by analogous federal law discussed above, this claim must be dismissed. Connecticut's remaining state law claims are for civil penalties, injunctive relief, restitution on behalf of the State as a direct purchaser, and attorney fees and costs.

### v. Florida

 Defendants challenge Florida's claims for damages under the Florida Antitrust Act (the "FAA"), damages under the Florida Deceptive and Unfair Trade Practices Act (the "FDUTPA") and restitution and disgorgement under the FAA or FDUTPA. Florida is seeking damages under the FAA only for direct purchases. As discussed above, the States sufficiently pleaded direct purchases. Thus, Florida's claim for damages is sufficient to survive this motion to dismiss.

The Court will not dismiss Florida's claim seeking damages for indirect purchasers under the FDUTPA. Although allowing such a claim increases the risk of duplicative recovery as discussed above, the Florida Court of Appeals has specifically held that an indirect purchaser has standing to bring a suit for damages under the FDUTPA. *See Mack v. Bristol–Myers Squibb Co.*, 673 So.2d 100 (Fla. 1st Dist.Ct.App.1996), review dismissed, 689 So.2d 1068 (Fla. Jan.31, 1997). Because "an intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination,...in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question," *Fidelity Union Trust Co.*, 311 U.S at 178, 61 S.Ct. 176, the Court will deny Defendants' motion to dismiss on this issue.

On the other hand, Florida's contention that the Florida Antitrust Act or the FDUTPA authorizes restitution or disgorgement will be dismissed. Neither statute expressly authorizes such monetary equitable relief, and, as discussed above, this Court follows the logic of *Illinois Brick* in denying such additional relief. Claims still standing include civil penalties, injunctive relief, damages for direct and indirect purchasers, and attorney fees and costs.

### vi. Idaho

■ The disputed issues include Idaho's claims for recovery on behalf of indirect purchasers under the Idaho Antitrust Law, and for restitution for indirect purchasers under the Idaho Consumer Protection Act (the "ICPA"). Idaho's claim that it may recover on behalf of indirect purchasers under the Idaho Antitrust Law must be dismissed. Neither the statute nor subsequent case law grants standing to indirect purchasers, and Idaho antitrust law is guided by federal law. *See Pope v. Intermountain Gas Co.*, 103 Idaho 217, 646 P.2d 988 (1982) (stating that federal antitrust decisions offer persuasive guidance as to the interpretation of all provisions of the Idaho Antitrust Law that are based on federal antitrust statutes). Because there is no express *Illinois Brick* repealer provision, therefore, Idaho's damages claim on behalf of indirect purchasers must be dismissed.

■ The Court will not dismiss Idaho's claim that it should be allowed to seek restitution and disgorgement on behalf of indirect purchasers under the ICPA, however. Under Idaho law, great weight is given to the FTC's interpretation of the FTC Act in the construction of the ICPA. *See* Idaho Code § 48–604(a). Because this Court has found that the FTC Act authorizes equitable monetary relief, *see supra*, at 36–42, the Court will similarly deny the motion with regard to the ICPA. Thus, Idaho's remaining state law claims are for civil penalties, injunctive relief, restitution on behalf of direct and indirect purchasers, damages on behalf of direct purchasers, and attorney fees and costs.

### vii. Iowa

■ Defendants contest Iowa's claims for actual damages on behalf of indirect purchasers and for restitution and disgorgement on behalf of indirect purchasers. Both claims must be dismissed. The Iowa Competition law should be interpreted "to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter." Iowa Code 553.2. Because federal law does not give indirect purchasers standing, as discussed above, absent an explicit statutory grant of authority to the State to sue on behalf of indirect purchasers, these claims must be dismissed. Although the Iowa Competition Law allows the Court to grant equitable relief in an antitrust suit brought by the state or the injured party, it nowhere authorizes the State to seek restitution and disgorgement on behalf of indirect purchasers. Therefore, the Court will follow the reasoning of *Illinois Brick* and dismiss both of Iowa's disputed claims. Remaining claims include civil penalties, injunctive relief, damages on behalf of direct purchasers, restitution on behalf of direct purchasers, and attorney fees and costs.

### viii. Kentucky

■ Defendants challenge Kentucky's allegations that the state may seek relief for indirect purchasers in the form of damages or in the form of restitution and disgorgement. The Court will dismiss both claims. No provision in the Kentucky Consumer Protection Act gives the state express authority to bring such a suit, and state case law is divided on the issue. Kentucky cites one opinion which held that the legislature, in enacting KRS 367.200, intended to grant the State Attorney General authority to seek restitution on behalf of indirect purchasers. *See Commonwealth of Kentucky ex. rel. Beshear v. ABAC Pest Control, Inc.*, 621 S.W.2d 705

(Ky.App.1981). Several more recent cases, however, have determined that "[t]he legislature intended that privity of contract exist between the parties in a suit alleging a violation of the Consumer Protection Act." *Skilcraft Sheetmetal, Inc. v. Kentucky Machinery, Inc.*, 836 S.W.2d 907, 909. *See also Kentucky Laborers District Council Health and Welfare Trust Fund v. Hill & Knowlton, Inc.*, 24 F.Supp.2d 755 (W.D.Ky.1998); *Anderson v. National Sec. Fire and Casualty Co.*, 870 S.W.2d 432, 436 (Ky.App.1993). Because Kentucky's case law is divided on the issue and because authorizing damages or equitable monetary relief to indirect purchasers would increase the risk of duplicative recovery as discussed above, defendants' motion to dismiss will be granted as to this issue. Kentucky's remaining state law claims are for civil penalties, injunctive relief, damages and restitution and/or disgorgement on behalf of direct purchasers, and attorney fees and costs.

### ix. Louisiana

■ The disputed issues include whether Louisiana may assert claims under the Louisiana Monopolies Act, La.Rev. Stat. Ann §§ 51:121 *et seq.*, whether indirect purchasers have a right of recovery, whether the State has authority under the Consumer Protection Act (the "CPA") to seek damages on its own behalf, and whether the State has authority to seek restitution and/or disgorgement. The Monopolies Act applies to "restraint[s] of trade or commerce in this state." La.Rev. Stat. Ann. § 51:122. The language of the statute is ambiguous as to whether the violation of the Act must occur intrastate. Although the issue has arisen, no state court has answered the question. *See Free v. Abbott Labs.*, 739 So.2d 216 (La. 1999) (denying certification on the issue of whether the Monopolies Act applies to interstate commerce). Because state courts are undecided on the issue, the Court will allow the claim to stand for the time being and will reassess this claim at summary judgment or thereafter. Even if Louisiana

proceeds with its Monopolies Act claims, however, it may not seek relief on behalf of indirect purchasers under the Act. State courts have held that federal antitrust law should be used as guidance in interpreting the Monopolies Act. *See Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 493 So.2d 1149, 1158 (La.1986). Therefore, because federal law does not give indirect purchasers standing, the State's claim for relief on behalf of indirect purchasers under the Monopolies Act will be dismissed. Similarly, the State's claim for equitable monetary relief under the Monopolies Act will be dismissed because no statute or state case expressly authorizes such relief, and the Clayton Act, as discussed above, does not grant equitable monetary relief.

■ Louisiana's claim for damages on behalf of all direct and indirect purchasers under the CPA will also be dismissed. All claims on behalf of purchasers other than the State will be denied because the CPA provides that an injured person may "bring an action individually but not in a representative capacity to recover actual damages." La.Rev.Stat. Ann. § 51:1409(A). The State's claim for damages on its own behalf under the CPA must also be dismissed because state case law has determined that only consumers and competitors have standing to sue for damages under the CPA, *see Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.*, 922 F.2d 220, 225–26 (5th Cir. 1991), and that the term "consumer" only applies to natural persons. *See Shaw Industries v. Brett*, 884 F.Supp. 1054, 1057–58 (M.D.La.1994). Because the State is neither a competitor nor a consumer under the definition provided by state law, its claim for damages on its own behalf under the CPA will be dismissed. The claims still standing include civil penalties, injunctive relief, and attorney fees and costs.

### x. Maine

■ Maine's claims seeking damages on behalf of indirect purchasers and

seeking restitution and disgorgement under its antitrust statute, as well as all claims under the Unfair Trade Practices Act (the "UTPA") must be dismissed. Nothing in Maine's antitrust statute authorizes Maine to bring an antitrust claim on behalf of indirect purchasers. *See* Me. Rev.Stat. Ann. tit. 1, § 1104. In *Maine v. M/V Tamano*, the court held that the State may recover damages in a representative capacity only when it has a "quasi-sovereign interest" in the suit. *See* 357 F.Supp. 1097 (D.Me.1973). "Quasi-sovereign interest" is defined as "an interest of the State independent of and behind titles of its citizens, that is...the State must show a direct interest of its own and not merely seek recovery for the benefit of individuals who are the real parties in interest." Because Maine has no quasi-sovereign interest in suing on behalf of indirect purchasers and because doing so would increase the risk of multiple recovery, the Court will grant the motion to dismiss on this issue. Additionally, Maine's claim that its antitrust statute authorizes the State to seek equitable monetary relief is incorrect. The statute allows for equitable injunctive relief, but fails to mention restitution or disgorgement. *See* Me.Rev.Stat. Ann. tit. 10 § 1104. As discussed above, absent express authority from state statutes or case law, restitution and disgorgement are not authorized. Additionally, all claims under the UTPA must be dismissed as the statute does not apply to antitrust claims. *See* Me.Rev.Stat. Ann. tit. 5 § 209. Maine's remaining state law claims are for civil penalties, damages on behalf of direct purchasers, injunctive relief, and attorney fees and costs.

### xi. Michigan

■■■ The Court will deny defendants' motion to dismiss all claims under § 445.903(1)(z) of Michigan's Consumer Protection Act (the "MCPA"), as well as the motion to dismiss Michigan's claim for treble damages. Defendants claim that the MCPA applies only to transactions in which a consumer is charged a grossly excessive price for property or services, and state that "State Medicaid programs, wholesalers, retail pharmacy chains and other customers" are not "consumers" under the plain meaning of the word. *See* Defendants' Reply at 44. There is no authority, however, for the proposition that such programs and pharmacies that purchased the drugs should not be considered consumers. Defendants' allegation that the MCPA claims should also be dismissed because the drugs were purchased by state agencies and therefore not "primarily for personal, family or household purposes," *see* Mich. Comp. L. Ann § 445.902(d), is similarly denied. The language of the statute does not indicate whether the above-quoted phrase modifies the way in which the drugs were provided or the drugs themselves. Drugs sold to state medicaid programs or drug stores are not outside the scope of personal, family or household purchases. The Court will also deny defendants' motion to dismiss Michigan's claim for treble damages based on the State's failure to plead that Defendants' violations were flagrant as required by MCLA 445.778(2). The State complaint sufficiently alleges the flagrant nature of defendants' actions. *See* State Compl. ¶ 38. Restitution and/or disgorgement on behalf of direct and indirect purchasers will be allowed under the Michigan Antitrust Reform Act which states that the State as well as directly or indirectly injured purchasers may receive injunctive or "other equitable relief." Mich. Comp. Laws 445.778(1), 445.778(2). Thus, remaining claims include civil penalties, damages on behalf of both the State and indirect purchasers, injunctive relief, restitution and disgorgement on behalf of both direct and indirect purchasers, and attorney fees and costs.

### xii. Minnesota

■■■ Defendants challenge Minnesota's claim for restitution and disgorgement. The Court will grant defendants' motion to dismiss on this issue. The Antitrust Law

(Minn.Stat. §§ 325D.49–325D.66) does not expressly authorize such relief and Minn. Stat. § 8.31(3) allows "other equitable relief" but limits such relief to injunctions and penalties under $25,000. Because Minnesota is guided by federal antitrust law, *see State by Humphrey v. Alpine Air,* 490 N.W.2d 888 (Minn.Ct.App.1992), *aff'd,* 500 N.W.2d 788 (Minn.1993), which does not allow monetary equitable relief under the Clayton Act, and because Minn.Stat. § 325D.57 states that Minnesota should "take any steps necessary to avoid duplicative recovery," the State may not seek restitution and disgorgement. The claims still standing include civil penalties, damages on behalf of both the State and indirect purchasers, injunctive relief, and attorney fees and costs.

### *xiii. Missouri*

██ The disputed issues include whether Missouri may seek any remedies under the Merchandising Practices Act (the "MPA"), whether the MPA authorizes damages relief for indirect purchasers, whether the MPA authorizes restitution on behalf of government entities, and whether the State may seek civil penalties. The Court will not dismiss all claims under the MPA at this time. The administrative rules necessary to the enforcement of the MPA state that an unfair practice includes any practice which "presents a risk of, or causes, substantial injury to consumers." 15 CSR 60–8.020. Because the State complaint sufficiently pleads actions by defendants that present a risk of or cause substantial injury, Missouri is authorized to bring suit under the MPA.

██ Insofar as Missouri seeks damages relief on behalf of the State or State entities, such claims are authorized under Missouri Antitrust Law, Mo. Stat. Ann. §§ 416.011 *et seq.* The Court will not dismiss Missouri's claims for equitable monetary relief on its own behalf under the MPA because it is not clear that the definition of "persons" in Mo. Stat. Ann. § 407.010(5) excludes the State; it may be included in the category of "other legal entity." Additionally, as discussed above, the requirement that the goods be purchased "primarily for personal, family or household purposes" does not exclude the State or State entities. Defendants do not contest the State's authority to seek restitution and/or disgorgement on behalf of indirect purchasers under the MPA in light of *Campos v. Ticketmaster Corp.,* 140 F.3d 1166, 1172 (8th Cir.1998) (holding that even if indirect purchasers are barred from seeking damages relief, they may still obtain injunctive relief.). The MPA also authorizes civil penalties up to $1000 per violation. *See* Mo. Stat. Ann. § 407.100, subd. 6. Therefore, the State's claim for such relief will not be dismissed. The State's claim for damages relief for indirect purchasers must be dismissed, however. Neither the Antitrust law nor the MPA provides an *Illinois Brick* repealer provision; therefore, as discussed above, such relief will be denied. Missouri's remaining state law claims are for civil penalties, injunctive relief, damages for direct purchasers, restitution and disgorgement on behalf of direct and indirect purchasers, and attorney fees and costs.

### *xiv. New York*

██ The only disputed issue beyond the procedural defect discussed above is the State's failure to commence the claim in state court. Defendant's motion to dismiss on this issue will be denied. Although the normal procedure for claims brought under New York Executive Law § 63(12) is to apply to the state supreme court, this step would be illogical in the instant case. Federal supplemental jurisdiction is warranted because the facts underlying the federal and state claims are similar enough to create a "common nucleus of operative facts" which would be expected to be tried in one judicial proceeding. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Defendants provide no argument supporting the allegation that

claims brought under § 63(12) should be excepted from this rule. New York's remaining state law claims are for civil penalties, damages on behalf of direct and indirect purchasers, injunctive relief, restitution and/or disgorgement on behalf of direct and indirect purchasers, and attorney fees and costs.

### xv. North Carolina

■ Defendants' motion to dismiss will be denied as to both of the disputed issues: the State's claims for damages on behalf of indirect purchasers and for equitable monetary relief. Although this Court is dismissing most state claims for damages on behalf of indirect purchasers, North Carolina's state case law expressly authorizes such claims. See Hyde v. Abbott Laboratories, Inc., 123 N.C.App. 572, 573, 473 S.E.2d 680 (1996). Defendants' motion to dismiss on this issue will therefore be denied.

■ The Hyde opinion does not address the issue of restitution and disgorgement on behalf of indirect purchasers. Although § 75–15.1 allows the presiding judge to restore "any moneys or property...obtained by any defendant" as a result of any violation of the antitrust laws, the statute does not address the issue of restitution for indirect purchasers. North Carolina's claims for restitution on behalf of indirect purchasers are therefore dismissed. Claims still standing include civil penalties, damages on behalf of both direct and indirect purchasers, injunctive relief, restitution and disgorgement on behalf of both direct and indirect purchasers, and attorney fees and costs.

### xvi. Ohio

■ The Court will grant defendants' motion to dismiss as to both disputed issues: Ohio's claim for damages on behalf of indirect purchasers and its claim for restitution on behalf of indirect purchasers. Neither Ohio's antitrust legislation nor its relevant case law explicitly authorizes the State to bring suit on behalf of indirect purchasers. Although Ohio Rev.Code § 1331.0, speaks to conduct that is directly or indirectly anticompetitive, it does not provide relief to indirect purchasers. Because no express authority under state law is given, federal antitrust law is used as a guide. Illinois Brick is therefore controlling here, and Ohio's claims on behalf of indirect purchasers must be dismissed. Additionally, because federal antitrust law states that duplicative recovery must be avoided, Ohio also may not seek restitution and disgorgement on behalf of indirect purchasers. Thus, Ohio's remaining state law claims are for civil penalties, damages and restitution and/or disgorgement on behalf of direct purchasers, and attorney fees and costs.

### xii. Oklahoma

■ Oklahoma's claims will be dismissed insofar as the State purports to bring suit on behalf of indirect purchasers and seeks monetary equitable relief on behalf of indirect purchasers. Oklahoma's Antitrust Reform Act does not authorize a suit on behalf of indirect purchasers. See Okla. Stat. Ann. tit. 79 § 212. As discussed above, when no state statutory or case law expressly authorizes such relief, federal antitrust law serves as a guide and under federal law, indirect purchasers do not have standing. See Illinois Brick, 431 U.S. at 730, 97 S.Ct. 2061. The State cannot bring the claim under the Consumer Protection Act because that statute fails to apply to indirect purchasers as well. Oklahoma's claim for restitution on behalf of indirect purchasers must also be denied. Nowhere in the antitrust or consumer protection statutes is equitable monetary relief on behalf of indirect purchasers provided for. Thus, Oklahoma's remaining state law claims are for damages on behalf of direct purchasers, restitution on behalf of direct purchasers, injunctive relief, and attorney fees and costs.

### xiii. Oregon

■ The Court will dismiss Oregon's claims under the Oregon Antitrust Act be-

cause the legislative purpose of the statute is that it apply only to "intrastate trade or commerce, and to interstate trade or commerce which is primarily of an intrastate nature and over which federal jurisdiction, for whatever reason, has not been exercised by the Federal Trade Commission or the United States Department of Justice." Or.Rev.Stat. § 646.715. Oregon does not deny that this suit is primarily of an interstate nature or that the FTC, in the parallel action, is exercising federal jurisdiction. Although Oregon cites to witness testimony of legislative purpose, and contends that this provision is not jurisdictional, the plain language of the provision states that the Antitrust Act is not applicable in this case. Therefore, all of Oregon's state law claims are dismissed from this case.

### xix. South Carolina

■ Defendants contest all of South Carolina's claims under the Unfair Trade Practices Act (the "UTPA"), the State's claim that the UTPA authorizes damages on behalf of indirect purchasers, the State's claim that the UTPA authorizes damages for itself, and the State's claim that the UTPA authorizes restitution on behalf of indirect purchasers. Defendants' motion to dismiss will be granted only insofar as South Carolina seeks damages and restitution on behalf of indirect purchasers. The Court will not dismiss all claims under the UTPA at this time. Although the South Carolina Antitrust statute applies only to intrastate conduct, the UTPA "is not limited to in-state conduct by its own terms..." *Cheshire v. Coca-Cola Bottling Affiliated, Inc.*, 758 F.Supp. 1098, 1101 (D.S.C.1990). Defendants cite no authority disputing this point. Defendant's claim that indirect purchasers may not seek damages or restitution will be granted, however. No provision in the statute expressly authorizes such relief and, as discussed above, absent explicit authorization by state statute or case law, such relief will not be granted. The Court will not dismiss the State's claim for damages for its own direct purchases at this

time. Although the definition of "person" under the statute does not list the State, the term "any other legal entity" may well apply to the State or state agencies who were direct purchasers of the drugs. Thus, South Carolina's remaining state law claims are for civil penalties, damages on behalf of direct purchasers, injunctive relief, restitution and/or disgorgement on behalf of direct purchasers, and attorney fees and costs.

### xx. Tennessee

■ The Court will dismiss all claims by Tennessee under the Trade Practices Act (the "TPA") and the Tennessee Consumer Protection Act (the "TCPA") because both statutes apply only to violations occurring in intrastate commerce. *See Standard Oil Co. v. State*, 117 Tenn. 618, 100 S.W. 705 (1907). Tennessee contends that in *Standard Oil* the court ruled that products that are imported into the state and "become commingled with the common mass of property of the state and subject to its laws" are included in the definition of intrastate commerce. *Id.* 100 S.W. at 711. Because the generic lorazepam and clorazepate tablets manufactured and distributed by defendants eventually came to rest in Tennessee, the State argues that they are part of intrastate commerce. This reading of *Standard Oil* is overly broad. The challenged conduct as to the product in question in *Standard Oil* was deemed intrastate because it occurred after the product had been imported, not before as in the instant case. *See id.* at 711–12. When the challenged conduct occurs before the products arrive in Tennessee, the conduct is considered interstate in nature and the TPA and TCPA should not apply. *See Dzik & Dzik, P.C. v. Vision Service Plan*, 1989 WL 3082 (Tenn.App.1989). Because this issue is dispositive as to all claims under the TPA and TCPA, defendants' motion to dismiss will be granted. Therefore, all of Tennessee's state law claims are dismissed from this case.

#### xxi. Texas

■ The only disputed issue under law Texas law is Texas' claim for restitution and disgorgement on behalf of indirect purchasers. Because Texas is required to follow federal antitrust law, *see* Tex. Bus. & Com.Code § 15.04, and both state and federal law prohibit damage relief on behalf of indirect purchasers, *see Abbott Labs., Inc. v. Segura,* 907 S.W.2d 503 (Tex. 1995); *Illinois Brick,* 431 U.S. at 730, 97 S.Ct. 2061, Texas' claim for restitution and disgorgement on behalf of indirect purchasers is dismissed. Texas' remaining state law claims are for civil penalties, injunctive relief, restitution and disgorgement on behalf of direct purchasers, and attorney fees and costs.

#### xii. Utah

■ The disputed issues are whether Utah can bring suit under the Unfair Trade Practices Act ("UTPA" or "the Act") and whether the State can bring suit on behalf of indirect purchasers for either damages or equitable monetary relief. Utah's claim for relief under the UTPA must be dismissed because the Act applies only to intrastate conduct. Although the drugs eventually came to rest in Utah, no alleged violation occurred in intrastate commerce. There is no Utah case interpreting the intrastate commerce requirement of the UTPA, and the cases cited by the State are inapposite as they deal with violations which occurred within the state. As discussed above, the violation, not just the end location of the product at issue, must have occurred intrastate for the statute to apply.

■ Utah's claims for damages on behalf of indirect purchasers and for restitution under its antitrust statute must also be dismissed. No statutory or common law authority specifically addresses the issue of damages for such purchasers or for equitable monetary relief. As discussed above, absent express authorization, such relief will not be granted. Thus, Utah's remaining state law claims are for civil

penalties, damages on behalf of direct purchasers, injunctive relief, and attorney fees and costs.

#### xiii. Vermont

■ The disputed issues include whether Vermont may seek restitutionary and damages relief on behalf of indirect purchasers, and treble damages for its own purchases. Vermont's claim that it may seek equitable monetary relief or damages relief on behalf of indirect purchasers must be dismissed. No provision exists in any state statute expressly allowing indirect purchaser suits. Moreover, in 1980 the court held that "the *Illinois Brick* decision requires plaintiff to allege purchases directly from the alleged price-fixing conspiracy between [supplier] and its Vermont...dealers." *See Vermont v. Densmore Brick Co.,* No. 78–297, 1980 WL 1846 (D.Vt.1980). As discussed above, when no express authority exists for damages or monetary equitable claims on behalf of indirect purchasers, such relief is not permitted. Vermont will be permitted to seek restitution and/or disgorgement on behalf of the State under the Vermont Consumer Fraud Act, which states that "[t]he attorney general may request and the court is authorized to render...an order for restitution of cash or goods on behalf of a consumer..." Vt. Stat. Ann. tit. 9 § 2458(b)(2). Defendants' claim that the State has not alleged that it is a consumer and therefore may not sue for treble damages is denied. The State sufficiently pleaded that it was a direct purchaser of the drugs in question. Vermont's remaining claims are for civil penalties, damages on behalf of the State as a direct purchaser, injunctive relief, restitution and/or disgorgement on behalf of direct purchasers, and attorney fees and costs.

#### xiv. Washington

■ The only disputed issue is whether the State may sue for restitution and disgorgement on behalf of indirect purchasers under Wash. Rev.Code § 19.86.080

and in light of *Blewett v. Abbott Laboratories,* 86 Wash.App. 782, 938 P.2d 842 (1997). Although the State may not seek equitable monetary relief on behalf of indirect purchasers without express authorization, the Washington Court of Appeals stated that "[i]f direct purchasers decide not to sue, the indirect purchaser is not entirely without a remedy. While a private plaintiff must be 'injured in his or her business or property' in order to bring any suit under the Act, this requirement does not exist in the section that enables action by the attorney general." *Id.* at 790, 938 P.2d 842. Although indirect purchasers can not bring actions for damages under Washington law, *Blewett* holds that the State may bring restitutionary claims on their behalf. Therefore, defendants' motion to dismiss this claim will be denied. Washington's remaining state law claims are for civil penalties, damages on behalf of direct purchasers, injunctive relief, restitution and/or disgorgement for direct and indirect purchasers, and attorney fees and costs.

#### xv. West Virginia

■ Defendants challenge West Virginia's ability to bring a claim under chapter 46 of the Consumer Credit and Protection Act (the "CCPA") and to seek restitution under the West Virginia Antitrust Act for direct and indirect purchasers. The Court holds West Virginia may not bring its claim under the CCPA. Although Article 6 of the Act states that the legislative purpose of that article is to "complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices," W.Va.Code §§ 46A–1–102, that statement applies only to Article 6, not to the entire chapter. The chapter applies only to consumers who have entered credit arrangements and is inapposite in the instant case.

■ The Court will also dismiss West Virginia's claim for restitution under the West Virginia Antitrust Act. W. Va.Code §§ 47–18–1 *et seq.* (1998). Because neither the Act nor state case law expressly authorizes such relief, it is not available for the reasons discussed above. West Virginia's claims for damages for its own purchases and on behalf of indirect consumers still stand. Therefore, remaining claims are for civil penalties, damages on behalf of direct and indirect purchasers, injunctive relief, and attorney fees and costs.

#### xvi. Conclusion

Defendants' motion to dismiss all claims under state statutes that apply only to intrastate violations of law will be granted in part and denied in part. Claims under statutes applying only to intrastate violations in South Carolina, Tennessee and Utah will be dismissed. The legal sufficiency of claims under Louisiana's Monopoly Act will be determined at summary judgment.[9] Defendants' motion to dismiss all damages claims for direct purchasers due to inadequate pleading will be denied as the States have sufficiently pleaded direct purchases. Defendants' argument that all damages claims based on the umbrella theory must be dismissed is granted under both federal and state law. Defendants' motion to dismiss damages claims on behalf of indirect purchasers unless expressly permitted by state law is granted; the individual state statutes are discussed above. Defendants' motion to dismiss claims for restitution and/or disgorgement on behalf of direct purchasers unless such relief is specifically authorized by state law is granted. The motion to dismiss restitutionary claims on behalf of indirect purchasers unless such relief is expressly authorized for such purchasers under state law is also granted; individual state statutes are discussed above. Finally, Defendants' arguments to dismiss claims based

**9.** The parties are invited to submit supplemental memoranda to the Court regarding

Louisiana's state law claims.

on specific state statutes are granted in part and denied in part as discussed in the individual state claims section above.

### D. Motions Applicable to Both FTC v. Mylan and State of Connecticut v. Mylan

The remaining four motions in these cases actually only amount to two, as nearly identical motions were filed in each case. These motions are considered in turn.

### 1. Defendants' Motion to Dismiss in Part Under Rule 12(b)(6)

Defendants move to dismiss the complaints in both actions pursuant to Rule 12(b)(6).[10] Defendants assert that the complaints' monopolization counts are defective because the relevant market is not adequately defined and, in any event, the allegations of monopoly power are insufficient. Defendants challenge the restraint of trade counts on the basis that their conduct was not unreasonable because it did not harm competition.

#### a. Monopolization

To state a Section 2 monopolization claim, a plaintiff must allege facts sufficient to establish both "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 480, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (*citing United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). Mylan alleges that the complaints fail this legal standard in two ways: (1) they fail to sufficiently identify a relevant

market; and (2) the complaints fail to allege facts sufficient to show monopoly power.

On the first issue, the complaints specifically identify four relevant markets: (1) generic lorazepam tablets; (2) generic clorazepate tablets; (3) lorazepam API; and (4) clorazepate API. FTC Compl. ¶ 17. Each of the relevant markets includes only those products approved for sale in the United States. This level of definition is sufficient to survive a motion to dismiss, as it is entirely plausible that plaintiffs will prove a set of facts that supports those market definitions. *See Daniel v. American Bd. of Emergency Medicine*, 802 F.Supp. 912, 925–26 (W.D.N.Y.1992) ("The notice pleading system requires only that the allegations in the complaint give notice as to what markets are being brought into issue."); *see also Michael Anthony Jewelers v. Peacock Jewelry*, 795 F.Supp. 639, 647 (S.D.N.Y.1992).

Mylan's second claim is that the Amended Complaint fails to establish the monopoly power element of the monopolization claim. In economic terms, "[m]onopoly power is the power to raise prices well above competitive levels before customers will turn elsewhere." *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 31 (1st Cir.1990). The complaints meet this standard by alleging that Mylan instituted massive and successful price increases for lorazepam and clorazepate. Furthermore, the complaints allege that Mylan constricted the supply of generic lorazepam and clorazepate tablets by denying its competitors the APIs to manufacture these products. Like the ability to control prices, this is evidence of monopoly power. *See Great Western Directories v. Southwestern Bell Tel.*, 63 F.3d 1378, 1384

---

**10.** Mylan moves to dismiss the monopolization and restraint of trade claims asserted by plaintiffs in both actions. Defendants Cambrex, Profarmaco and Gyma—which are not named in the plaintiffs' monopolization claims—join with Mylan in moving to dismiss the complaints' restraint of trade claims.

(5th Cir.1995). Thus, Mylan's motion is denied on this issue.

### b. Unreasonable Restraint of Trade

■ Defendants assert that the unreasonable restraint of trade counts must be dismissed as plaintiffs have failed to allege any restraint on competition. This claim is easily disposed of, as the allegations of massive price increases, when combined with anti-competitive conduct such as the exclusive licensing agreements, are sufficient to support a claim for unreasonable restraint of trade. *See, e.g., Reiter v. Sonotone*, 442 U.S. 330, 342, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her "property" under § 4); *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic & Sec. Health Plan of Wisconsin*, 65 F.3d 1406, 1415 (7th Cir.1995) ("a *lawful* monopolist may charge what it wants") (emphasis added). Defendants motion is therefore denied on this issue.

### c. Price–Fixing Count

■ Defendants' motion to dismiss in *State of Connecticut v. Mylan* contains one additional argument, which is that this Court should dismiss the ninth count included in the State complaint but omitted from the FTC complaint. This count alleges that Mylan, Cambrex, Profarmaco, Gyma and SST conspired to fix, raise, or stabilize the prices of lorazepam API, a *per se* violation of § 1 of the Sherman Act. Defendants Cambrex, Profarmaco and Gyma move to dismiss on the ground that the State complaint fails to allege any facts that show involvement by those defendants in a price-fixing agreement.

The State complaint alleges that Mylan met in Pittsburgh with SST in order to enter an exclusive licensing agreement. The States allege that at this meeting Mylan and SST conspired to raise the price of lorazepam API, thus ensuring a rise in the price of lorazepam tablets. The States further allege that this attempt was made with the full knowledge and consent of Cambrex/Profarmaco and Gyma, who benefitted from the price-fixing agreement through higher profits. *See* State Compl. ¶ 88.

The allegations in the State complaint are sufficient to survive a motion to dismiss. The States have alleged the existence of circumstantial evidence suggesting a price-fixing conspiracy in violation of § 1 of the Sherman Act. "Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.Cir. 1983); *accord Alvord–Polk, Inc. v. F. Schumacher and Co.*, 37 F.3d 996, 1000 (3d Cir., 1994) ("An agreement need not be explicit to result in section 1 liability . . ., and may instead be inferred from circumstantial evidence"). Thus, defendants' motion to dismiss this count is denied.

### 2. Defendant Gyma's Motion to Dismiss Under Rule 12(b)(6)

■ Gyma has moved to dismiss both complaints insofar as they name Gyma as a defendant. The gist of Gyma's motion to dismiss is that Gyma was not a party to the 10–year exclusive licensing agreements between Profarmaco and Mylan. While plaintiffs concede that Gyma was not a name party to the exclusive licensing agreements, the complaints allege that Gyma materially aided in the creation of the agreements. *See* FTC Compl. ¶ 21; State Compl. ¶ 35. Specifically, Gyma was present at and participated in the negotiations between Profarmaco and Mylan for the exclusive licenses. *Id.* Furthermore, Gyma benefitted financially from the existence of the exclusive licenses through its profit sharing agreement with Mylan. *See* FTC Compl ¶ 26 ("The Gyma–Mylan profit sharing agreements are the *quid pro quo* for Gyma's aid in furthering the licensing agreements."). These allegations are sufficient to support the complaints' allega-

tions against Gyma on a motion to dismiss. *See Monsanto v. Spray–Rite Service Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (legal standard for restraint of trade is whether plaintiff has "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' "); *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) ("[o]nce any conspirator takes an act in furtherance of the conspiracy...each member of the conspiracy is liable, whether or not they know or approve of each specific act."). Thus, Gyma's motion is denied.

### III. CONCLUSION

For the reasons stated above, defendants' motion to dismiss the States Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) is granted in part and denied in part. All other motions are denied.

An appropriate Order will accompany this Memorandum Opinion.

**Appendix A**
**Remaining State Law Claims**

| | Injunctive Relief | Restitution Indirect Purch. | Restitution Direct Purch. | Damages Indirect Purchaser | Damages Direct Purchaser | Civil Penalties | Atty Fees |
|---|---|---|---|---|---|---|---|
| Alaska | X | | X | | | X | X |
| Arkansas | X | | X | | X | X | X |
| CA | X | X | X | X | X | X | X |
| Colorado | X | | | | X | | X |
| Conn. | X | | X | | | X | X |
| DC | X | | | X | X | | X |
| Florida | X | | | X | X | X | X |
| Idaho | X | X | X | | X | X | X |
| Illinois | X | X | X | X | X | X | X |
| Iowa | X | | X | | X | X | X |
| Kentucky | X | | X | | X | X | X |
| Louisiana | X | | | | | X | X |
| Maine | X | | | | X | X | X |
| Michigan | X | X | X | X | X | X | X |
| Minnesota | X | | | X | X | X | X |
| Missouri | X | X | X | | X | X | X |
| NM | X | X | X | X | X | X | X |
| New York | X | X | X | X | X | X | X |
| NC | X | X | X | X | X | X | X |
| Ohio | X | | X | | X | X | X |
| Oklahoma | X | | X | | X | | X |
| Oregon | | | | | | | |
| SC | X | | X | | X | X | X |
| SD | X | X | X | X | X | X | X |
| Tennessee | | | | | | | |

58

| | Injunctive Relief | Restitution Indirect Purch. | Restitution Direct Purch. | Damages Indirect Purchaser | Damages Direct Purchaser | Civil Penalties | Atty Fees |
|---|---|---|---|---|---|---|---|
| Texas | X | | X | | | X | X |
| Utah | X | | | | X | X | X |
| Vermont | X | | X | | X | X | X |
| Wash | X | X | X | | X | X | X |
| WV | X | | | X | X | X | X |
| Wisconsin[11] | X | X | X | X | X | X | X |

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that defendants' motion to dismiss the FTC's amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) is **DENIED**; it is further

**ORDERED** that defendants' motion to dismiss the FTC's amended complaint in part pursuant to Fed.R.Civ.P. 12(b)(6) is **DENIED**; it is further

**ORDERED** that defendant Gyma Corporation's motion to dismiss the FTC's amended complaint pursuant to Fed. R.Civ.P. 12(b)(6) is **DENIED**; it is further

**ORDERED** that defendants' motion to dismiss the States' amended complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) is **GRANTED IN PART** and **DENIED IN PART**; specifically, the motion is **GRANTED** insofar as

Alaska's claim for restitution and/or disgorgement for indirect purchasers is **DISMISSED**;

Arkansas' claims under the Arkansas Antitrust Law, its claim for damages relief for indirect purchasers, and its claim for restitution and/or disgorgement for indirect purchasers are **DISMISSED**;

Colorado's claim for civil penalties and its claim for restitution and/or disgorgement for direct and indirect purchasers are **DISMISSED**;

Connecticut's claim for restitution and/or disgorgement for indirect purchasers is **DISMISSED**;

Florida's claim for restitution and/or disgorgement for direct and indirect purchasers is **DISMISSED**;

Idaho's claim for damages relief for indirect purchasers is **DISMISSED**;

Iowa's claim for damages relief for indirect purchasers and its claim for restitution and/or disgorgement for indirect purchasers are **DISMISSED**;

Kentucky's claim for damages relief for indirect purchasers and its claim for restitution and/or disgorgement for indirect purchasers are **DISMISSED**;

Louisiana's claim for damages relief for direct and indirect purchasers and its claim for restitution and/or disgorgement for direct and indirect purchasers are **DISMISSED**;

Maine's claim for damages relief for indirect purchasers, its claim for restitution and/or disgorgement for direct and indirect purchasers, and all claims under the Maine Unfair Trade Practices Act are **DISMISSED**;

Minnesota's claim for restitution and/or disgorgement for direct and indirect purchasers is **DISMISSED**;

Missouri's claim for damages relief for indirect purchasers is **DISMISSED**;

11. Wisconsin also seeks judgment declaring void all contracts or agreements directly or indirectly connected with violations of Wis. Sta. § 133.03, and for all payments which relate directly or indirectly to such contracts or agreements.

Ohio's claims for damages relief for indirect purchasers and its claim for restitution and/or disgorgement for indirect purchasers are **DISMISSED**;

Oklahoma's claim for damages on behalf of indirect purchasers and its claim for restitution and/or disgorgement on behalf of indirect purchasers are **DISMISSED**;

All of Oregon's state law claims are **DISMISSED**;

South Carolina's claim for damages relief for indirect purchasers and its claim for restitution and/or disgorgement for indirect purchasers will be **DISMISSED**;

All of Tennessee's state law claims are **DISMISSED**;

Texas' claim for restitution and/or disgorgement for indirect purchasers is **DISMISSED**;

Utah's claim for damages relief for indirect purchasers, its claim for restitution and/or disgorgement for direct and indirect purchasers, and all claims under the Utah Unfair Trade Practices Act are **DISMISSED**;

Vermont's claim for damages relief for indirect purchasers and its claim for restitution and/or disgorgement for indirect purchasers are **DISMISSED**;

West Virginia's claim for restitution and/or disgorgement for direct and indirect purchasers and all claims under the West Virginia Consumer Credit and Protection Act are **DISMISSED**.

All other portions of defendants' motion to dismiss the States' amended complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) are **DENIED**; it is further

**ORDERED** that defendants' motion to dismiss the States' amended complaint pursuant to Fed.R.Civ.P. 12(b)(6) is **DENIED**; it is further

**ORDERED** that defendant Gyma Corporation's motion to dismiss the FTC's amended complaint pursuant to Fed. R.Civ.P. 12(b)(6) is **DENIED**.

**SO ORDERED**.